169 U.S. 466 (1898)
SMYTH
v.
AMES.
SMYTH
v.
SMITH.
SMYTH
v.
HIGGINSON.
Nos. 49, 50, 51.
Supreme Court of United States.
Argued April 5, 6, 7, 1897.
Decided March 7, 1898.
APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEBRASKA.
*478 Mr. John L. Webster for appellants. Mr. A.S. Churchill, attorney general of the State of Nebraska, was on his brief.
Mr. William J. Bryan for appellants.
Mr. J.M. Woolworth for appellees.
Mr. James C. Carter for appellees.
*515 MR. JUSTICE HARLAN, after stating the case as above reported, delivered the opinion of the court.
The first question to be considered is one common to all the cases. While it was not objected at the argument that there had been any departure from the 94th Equity Rule, it was contended that the plaintiffs had an adequate remedy at law, and that the Circuit Court of the United States, sitting in equity, was therefore without jurisdiction. This objection is *516 based upon the fifth section of the Nebraska statute authorizing any railroad company to show, in a proper action brought in the Supreme Court of the State, that the rates therein prescribed are unreasonable and unjust and, if that court found such to be the fact, to obtain an order upon the Board of Transportation permitting the rates to be raised to any sum in the discretion of that Board, provided that in no case should they be fixed at a higher sum than was charged by the company on the first day of January, 1893. This section, it is contended, took from the Circuit Court of the United States its equity jurisdiction in respect of the rates prescribed and required the dismissal of the bills.
We cannot accept this view of the equity jurisdiction of the Circuit Courts of the United States. The adequacy or inadequacy of a remedy at law for the protection of the rights of one entitled upon any ground to invoke the powers of a Federal court, is not to be conclusively determined by the statutes of the particular State in which suit may be brought. One who is entitled to sue in the Federal Circuit Court may invoke its jurisdiction in equity whenever the established principles and rules of equity permit such a suit in that court; and he cannot be deprived of that right by reason of his being allowed to sue at law in a state court on the same cause of action. It is true that an enlargement of equitable rights arising from the statutes of a State may be administered by the Circuit Courts of the United States. Case of Broderick's Will, 21 Wall. 503, 520; Holland v. Challen, 110 U.S. 15, 24; Dick v. Foraker, 155 U.S. 404, 415; Bardon v. Land & River Imp. Co., 157 U.S. 327, 330; Rich v. Braxton, 158 U.S. 375, 405. But if the case in its essence be one cognizable in equity, the plaintiff  the required value being in dispute  may invoke the equity powers of the proper Circuit Court of the United States whenever jurisdiction attaches by reason of diverse citizenship or upon any other ground of Federal jurisdiction. Payne v. Hook, 7 Wall. 425, 430; McConihay v. Wright, 121 U.S. 201, 205. A party by going into a national court does not, this court has said, lose any right or appropriate remedy of which he *517 might have availed himself in the state courts of the same locality; that the wise policy of the Constitution gives him a choice of tribunals. Davis v. Gray, 16 Wall. 203, 221; Cowley v. Northern Pacific Railroad, 159 U.S. 569, 583. So, "whenever a citizen of a State can go into the courts of a State to defend his property against the illegal acts of its officers, a citizen of another State may invoke the jurisdiction of the Federal courts to maintain a like defence. A State cannot tie up a citizen of another State, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts." Reagan v. Farmers' Loan & Trust Co., 154 U.S. 362, 391; Mississippi Mills v. Cohn, 150 U.S. 202, 204; Cowles v. Mercer Co., 7 Wall. 118; Lincoln County v. Luning, 133 U.S. 529; Scott v. Neely, 140 U.S. 106; Chicot County v. Sherwood, 148 U.S. 529; Cates v. Allen, 149 U.S. 451.
In these cases the plaintiffs, stockholders in the corporations named, ask a decree enjoining the enforcement of certain rates for transportation upon the ground that the statute prescribing them is repugnant to the Constitution of the United States. Under the principles which in the Federal system distinguish cases in law from those in equity, the Circuit Court of the United States, sitting in equity, can make a comprehensive decree covering the whole ground of controversy and thus avoid the multiplicity of suits that would inevitably arise under the statute. The carrier is made liable not only to individual persons for every act, matter or thing prohibited by the statute, and for every omission to do any act, matter or thing required to be done, but to a fine of from one thousand to five thousand dollars for the first offence, from five thousand to ten thousand dollars for the second offence, from ten thousand to twenty thousand dollars for the third offence, and twenty-five thousand dollars for every subsequent offence. The transactions along the line of any one of these railroads, out of which causes of action might arise under the statute, are so numerous and varied that the interference of equity could well be justified upon the ground that a general decree, according to the prayer of the bills, would avoid a multiplicity *518 of suits, and give a remedy more certain and efficacious than could be given in any proceeding instituted against the company in a court of law; for a court of law could only deal with each separate transaction involving the rates to be charged for transportation. The transactions of a single week would expose any company questioning the validity of the statute to a vast number of suits by shippers, to say nothing of the heavy penalties named in the statute. Only a court of equity is competent to meet such an emergency and determine, once for all and without a multiplicity of suits, matters that affect not simply individuals, but the interests of the entire community as involved in the use of a public highway and in the administration of the affairs of the quasi-public corporation by which such highway is maintained.
Another question of a preliminary character must be here noticed. The answer of the officers of the State in each case insists that the real party in interest is the State, and that these suits are, in effect, suits against the State, of which the Circuit Court of the United States cannot take jurisdiction consistently with the Eleventh Amendment of the Constitution of the United States. This point is, perhaps, covered by the general assignments of error, but it was not discussed at the bar by the representatives of the State Board. It would therefore be sufficient to say that these are cases of which, so far as the plaintiffs are concerned, the Circuit Court has jurisdiction not only upon the ground of the diverse citizenship or alienage of the parties, but upon the further ground that, as the statute of Nebraska under which the State Board of Transportation proceeds is assailed as being repugnant to rights secured to the plaintiffs by the Constitution of the United States, the cases may be regarded as arising under that instrument. But to prevent misapprehension, we add that, within the meaning of the Eleventh Amendment of the Constitution, the suits are not against the State but against certain individuals charged with the administration of a state enactment, which, it is alleged, cannot be enforced without violating the constitutional rights of the plaintiffs. It is the settled doctrine of this court that a suit against individuals for *519 the purpose of preventing them as officers of a State from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the State within the meaning of that Amendment. Pennoyer v. McConnaughy, 140 U.S. 1, 10; In re Tyler, 149 U.S. 164, 190; Scott v. Donald, 165 U.S. 58, 68; Tindal v. Wesley, 167 U.S. 204, 220.
An important question is presented that relates only to the Union Pacific Company. That company is a corporation formed by the consolidation of several companies under the authority of acts of Congress, one of the constituent companies being the Union Pacific Railroad Company incorporated by the act of July 1, 1862, c. 120, 12 Stat. 489. United States v. Union Pacific Railway, 160 U.S. 1, 6. Neither that company nor the Union Pacific Railroad Company is named in the Nebraska statute, but the statute is interpreted by the State Board of Transportation as embracing the present defendant corporation. It is contended that the State is without power to fix or limit the rates that the Union Pacific Company may charge for the transportation of freight on its lines between points within Nebraska. This contention rests: 1. Upon the provisions of the acts of Congress showing that the Union Pacific Railroad Company was created for the accomplishment of national objects, namely, to secure the safe and speedy transportation of the mails, troops, munitions of war and public stores of the United States; 2. Upon the eighteenth section of the above act of July 1, 1862, 12 Stat. 489, 497, c. 120, providing that "whenever it appears that the net earnings of the entire road and telegraph, including the amount allowed for services rendered for the United States, after deducting all expenditures, including repairs and the furnishing, running and managing of said road, shall exceed ten per centum upon its cost, exclusive of the five per centum to be paid to the United States, Congress may reduce the rates of fare thereon, if unreasonable in amount, and may fix and establish the same by law." The argument is that Congress by this enactment has reserved to itself exclusive control of rates, interstate and local, to be charged on the Union Pacific Railroad. As this view, if maintained, would require *520 an affirmance of the decree so far as the Union Pacific Company is concerned, whether the Nebraska statute of 1893 be constitutional or not as to the other railroad corporations, it cannot properly be passed without examination.
In Reagan v. Mercantile Trust Co., 154 U.S. 413, 416, the question arose whether the Texas and Pacific Railway Company, a corporation organized under the laws of the United States, was subject to the laws of Texas with respect to rates for transportation wholly within that State. The ground upon which exemption from state control was there asserted by the company was that it received all its franchises from Congress, including the franchise to charge and collect tolls. This court, conceding, for the purposes of that case, that Congress had power to remove the corporation in all its operations from state control, held that the act creating it did not show an intention upon the part of Congress to exempt it from the duty to conform to such reasonable rates for local transportation as the State might prescribe, and that the enforcement by the State of reasonable rates for such transportation would not disable the corporation from performing the duties and exercising the powers imposed upon it by Congress. The court said: "By the act of incorporation Congress authorized the company to build its road through the State of Texas. It knew that, when constructed, a part of its business would be the carrying of persons and property from points within the State to other points also within the State, and that in so doing it would be engaged in a business, control of which is nowhere by the Federal Constitution given to Congress. It must have been known that, in the nature of things, the control of that business would be exercised by the State, and if it deemed that the interests of the nation and the discharge of the duties required on behalf of the nation from this corporation demanded exemption in all things from state control, it would unquestionably have expressed such intention in language whose meaning would be clear. Its silence in this respect is satisfactory assurance that, in so far as this corporation should engage in business wholly within the State, it intended that it should be subjected to the ordinary control *521 exercised by the State over such business. Without, therefore, relying at all upon any acceptance by the railroad corporation of the act of the legislature of the State, passed in 1873 in respect to it, we are of opinion that the Texas and Pacific Railway Company is, as to business done wholly within the State, subject to the control of the State in all matters of taxation, rates and other police regulations."
This conclusion, as may be observed from the opinion, was based in part upon the reasoning in Thomson v. Pacific Railroad, 9 Wall. 579, and in Railroad Company v. Peniston, 18 Wall. 5, in which cases it was held that the property of certain railroad companies was not exempt from state taxation by reason alone of the fact that they were organized under acts of Congress for the accomplishment of national objects, and that the imposition of such taxes was not, in a constitutional sense, an obstruction to the exercise of the powers of the General Government, nor an interference with the discharge of the duties required of the companies by their charters.
In the present case the question is more difficult of solution by reason of the declaration in the above act of July 1, 1862 (no similar declaration being made in the act incorporating the Texas and Pacific Railway Company), that Congress may reduce the rates of fare on the Union Pacific Railroad if unreasonable in amount, and may fix and establish the same by law whenever the net earnings of the entire road and telegraph, ascertained upon a named basis, should exceed ten per centum upon its cost, exclusive of the five per centum to be paid to the United States.
Undoubtedly Congress intended by that act to reserve such power as was necessary to prevent the corporation from exacting rates that were unreasonable. But this is not equivalent to a declaration that the States through which the railroad might be constructed should not regulate rates for transportation begun and completed within their respective limits.
It cannot be doubted that the making of rates for transportation by railroad corporations along public highways, *522 between points wholly within the limits of a State, is a subject primarily within the control of that State. And it ought not to be supposed that Congress intended that, so long as it forbore to establish rates on the Union Pacific Railroad, the corporation itself could fix such rates for transportation as it saw proper independently of the right of the States through which the road was constructed to prescribe regulations for transportation beginning and ending within their respective limits. On the contrary, the better interpretation of the act of July 1, 1862, is that the question of rates for wholly local business was left under the control of the respective States through which the Union Pacific Railroad might pass, with power reserved to Congress to intervene under certain circumstances and fix the rates that the corporation could reasonably charge and collect. Congress not having exerted this power, we do not think that the national character of the corporation constructing the Union Pacific Railroad stands in the way of a State prescribing rates for transporting property on that road wholly between points within its territory. Until Congress, in the exercise either of the power specifically reserved by the eighteenth section of the act of 1862 or its power under the general reservation made of authority to add to, alter, amend or repeal that act, prescribes rates to be charged by the railroad company, it remains with the States through which the road passes to fix rates for transportation beginning and ending within their respective limits.
We are now to inquire whether the Nebraska statute is repugnant to the Constitution of the United States.
By the Fourteenth Amendment it is provided that no State shall deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. That corporations are persons within the meaning of this Amendment is now settled. Santa Clara County v. Southern Pacific Railroad, 118 U.S. 394, 396; Charlotte, Columbia & Augusta Railroad v. Gibbes, 142 U.S. 386, 391; Gulf, Colorado & Santa Fé Railway v. Ellis, 165 U.S. 150, 154. What amounts to deprivation of property without due process of law or what is a denial of the equal *523 protection of the laws is often difficult to determine, especially where the question relates to the property of a quasi public corporation and the extent to which it may be subjected to public control. But this court, speaking by Chief Justice Waite, has said that, while a State has power to fix the charges by railroad companies for the transportation of persons and property within its own jurisdiction, unless restrained by valid contract, or unless what is done amounts to a regulation of foreign or interstate commerce, such power is not without limit; and that, "under pretence of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward, neither can it do that which in law amounts to the taking of private property for public use without just compensation, or without due process of law." Railroad Commission Cases, 116 U.S. 307, 325, 331. This principle was recognized in Dow v. Beidelman, 125 U.S. 680, 689, and has been reaffirmed in other cases. In Georgia Railroad & Banking Co. v. Smith, 128 U.S. 174, 179, it was said that the power of the State to prescribe the charges of a railroad company for the carriage of persons and merchandise within its limits  in the absence of any provision in the charter of the company constituting a contract vesting it with authority over those matters  was "subject to the limitation that the carriage is not required without reward, or upon conditions amounting to the taking of property for public use without just compensation; and that what is done does not amount to a regulation of foreign or interstate commerce." In Chicago, Milwaukee & St. Paul Railway v. Minnesota, 134 U.S. 418, 458, it was said: "If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law and in violation of the Constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection *524 of the laws." In Chicago & Grand Trunk Railway v. Wellman, 143 U.S. 339, 344, the court, in answer to the suggestion that the legislature had no authority to prescribe maximum rates for railroad transportation, said that "the legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates." In Budd v. New York, 143 U.S. 517, 547, the court, while sustaining the power of New York by statute to regulate charges to be exacted at grain elevators and warehouses in that State, took care to state, as a result of former decisions, that such power was not one "to destroy or a power to compel the doing of the services without reward, or to take private property for public use without just compensation or without due process of law."
In Reagan v. Farmers' Loan & Trust Co., 154 U.S. 362, 399, which involved the validity of certain rates for freights and passengers prescribed by a railroad commission established by an act of the legislature of Texas, this court, after referring to the above cases, said: "These cases all support the proposition that while it is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates for carriage, it is within the scope of judicial power and a part of judicial duty to restrain anything which, in the form of a regulation of rates, operates to deny to the owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property. There is nothing new or strange in this. It has always been a part of the judicial function to determine whether the act of one party (whether that party be a single individual, an organized body or the public as a whole) operates to divest the other party of any rights of person or property. In every constitution is the guarantee against the taking of private property for public purposes without just compensation. The equal protection of the laws which, by the Fourteenth Amendment, no State can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation. wrested from him for the benefit of another, or of the *525 public. This, as has been often observed, is a government of law, and not a government of men, and it must never be forgotten that under such a government, with its constitutional limitations and guarantees, the forms of law and the machinery of government, with all their reach and power, must in their actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held. It was, therefore, within the competency of the Circuit Court of the United States for the Western District of Texas, at the instance of the plaintiff, a citizen of another State, to enter upon an inquiry as to the reasonableness and justice of the rates prescribed by the railroad commission. Indeed, it was in so doing only exercising a power expressly named in the act creating the commission."
So, in St. Louis & San Francisco Railway v. Gill, 156 U.S. 649, 657, it was said that "there is a remedy in the courts for relief against legislation establishing a tariff of rates which is so unreasonable as to practically destroy the value of property of companies engaged in the carrying business, and that especially may the courts of the United States treat such a question as a judicial one, and hold such acts of legislation to be in conflict with the Constitution of the United States, as depriving the companies of their property without due process of law, and as depriving them of the equal protection of the laws." In Covington & Lexington Turnpike Road Co. v. Sandford, 164 U.S. 578, 584, 594-5, 597, which involved the validity of a state enactment prescribing rates of toll on a turnpike road, the court said: "A statute which, by its necessary operation, compels a turnpike company, when charging only such tolls as are just to the public, to submit to such further reduction of rates as will prevent it from keeping its road in proper repair, and from earning any dividends whatever for stockholders, is as obnoxious to the Constitution of the United States as would be a similar statute relating to the business of a railroad corporation having authority, under its charter, to collect and receive tolls for passengers and freight." And in Chicago, Burlington & Quincy Railroad v. Chicago, *526 166 U.S. 226, 241, it was held that "a judgment of a state court, even if it be authorized by statute, whereby private property is taken for the State or under its direction for public use, without compensation made or secured to the owner, is, upon principle and authority wanting in the due process of law required by the Fourteenth Amendment of the Constitution of the United States, and the affirmance of such judgment by the highest court of the State is a denial by that State of a right secured to the owner by that instrument."
In view of the adjudications these principles must be regarded as settled:
1. A railroad corporation is a person within the meaning of the Fourteenth Amendment declaring that no State shall deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.
2. A state enactment, or regulations made under the authority of a state enactment, establishing rates for the transportation of persons or property by railroad that will not admit of the carrier earning such compensation as under all the circumstances is just to it and to the public, would deprive such carrier of its property without due process of law and deny to it the equal protection of the laws, and would therefore be repugnant to the Fourteenth Amendment of the Constitution of the United States.
3. While rates for the transportation of persons and property within the limits of a State are primarily for its determination, the question whether they are so unreasonably low as to deprive the carrier of its property without such compensation as the Constitution secures, and therefore without due process of law, cannot be so conclusively determined by the legislature of the State or by regulations adopted under its authority, that the matter may not become the subject of judicial inquiry.
The cases before us directly present the important question last stated.
Before entering upon its examination, it may be observed that the grant to the legislature in the constitution of Nebraska *527 of the power to establish maximum rates for the transportation of passengers and freight on railroads in that State has reference to "reasonable" maximum rates. These words strongly imply that it was not intended to give a power to fix maximum rates without regard to their reasonableness. Be this as it may, it cannot be admitted that the power granted may be exerted in derogation of rights secured by the Constitution of the United States, or that the judiciary may not, when its jurisdiction is properly invoked, protect those rights.
What are the considerations to which weight must be given when we seek to ascertain the compensation that a railroad company is entitled to receive, and a prohibition upon the receiving of which may be fairly deemed a deprivation by legislative decree of property without due process of law? Undoubtedly that question could be more easily determined by a commission composed of persons whose special skill, observation and experience qualifies them to so handle great problems of transportation as to do justice both to the public and to those whose money has been used to construct and maintain highways for the convenience and benefit of the people. But despite the difficulties that confessedly attend the proper solution of such questions, the court cannot shrink from the duty to determine whether it be true, as alleged, that the Nebraska statute invades or destroys rights secured by the supreme law of the land. No one, we take it, will contend that a state enactment is in harmony with that law simply because the legislature of the State has declared such to be the case; for that would make the state legislature the final judge of the validity of its enactment, although the Constitution of the United States and the laws made in pursuance thereof are the supreme law of the land, anything in the constitution or laws of any State to the contrary notwithstanding. Art. VI. The idea that any legislature, state or Federal, can conclusively determine for the people and for the courts that what it enacts in the form of law, or what it authorizes its agents to do, is consistent with the fundamental law, is in opposition to the theory of our institutions. The duty rests upon all courts, Federal and state, when their *528 jurisdiction is properly invoked, to see to it that no right secured by the supreme law of the land is impaired or destroyed by legislation. This function and duty of the judiciary distinguishes the American system from all other systems of government. The perpetuity of our institutions and the liberty which is enjoyed under them depend, in no small degree, upon the power given the judiciary to declare null and void all legislation that is clearly repugnant to the supreme law of the land.
We turn now to the evidence in the voluminous record before us for the purpose of ascertaining whether  looking at the cases in the light of the facts as they existed when the decrees were rendered  the Nebraska statute, if enforced, would, by its necessary operation, have deprived the companies, whose stockholders and bondholders here complain, of the right to obtain just compensation for the services rendered by them.
The first and most important contention of the plaintiffs is that, if the statute had been in force during any one of the three years preceding its passage, the defendant companies would have been compelled to use their property for the public substantially without reward or without the just compensation to which it was entitled. We think this mode of calculation for ascertaining the probable effect of the Nebraska statute upon the railroad companies in question is one that may be properly used.
The conclusion reached by the Circuit Court was that the reduction made by the Nebraska statute in the rates for local freight was so unjust and unreasonable as to require a decree staying the enforcement of such rates against the companies named in the bill. Ames v. Union Pacific Railway, 64 Fed. Rep. 165, 189. That conclusion was based largely upon the figures presented by Mr. Dilworth, while he was a secretary of the State Board of Transportation, as well as a defendant and one of the solicitors of the defendants in these causes. He was a principal witness for that Board. His general fairness and his competency to speak of the facts upon which the question before us depends are apparent on the record. He stated that the average reduction made by the statute on all the "commodities of local rates" was 29.50 per cent; and this *529 estimate seems to have been accepted by the parties as correct. He estimated that the percentage of operating expenses on local business would exceed the percentage of operating expenses on all business by at least ten per cent, and that it might go as high as twenty per cent or higher. And this view is more than sustained by the evidence of witnesses possessing special knowledge of railroad transportation and of the cost of doing local business as compared with what is called through business. Indeed, one of those witnesses states that the cost of carrying local freight is four times as much as the cost of through freight per ton per mile; another, that the cost of the short haul is "reasonably double the long haul." If due regard be had to the testimony  and we have no other basis for our judgment  we are not permitted to place the extra cost of local business at less than ten per cent greater than the percentage of the cost of all business.
In answer to questions propounded to him by the defendants constituting the State Board of Transportation, Mr. Dilworth stated that he had prepared himself with an estimate showing the number of tons of freight, commonly spoken of as local freight, hauled on the respective railways in Nebraska, and the amount received by the railway companies by way of tariff on tons of freight hauled, including through as well as local freight, and was qualified to speak as to the amount received by the companies for both passengers and freight within the State, and the reduction that would take place in rates under the statute in question. He presented various tables showing the results of his investigations. One is known as Exhibit 4, and is an "Estimate of local business, and the effect of House Roll 33" on the Burlington, St. Paul, Fremont, Union Pacific, Omaha, St. Joseph and Kansas City Companies for the year 1892. Another is called Exhibit 19, and is a like estimate in respect of the same companies for the years 1891 and 1893. Another is known as Exhibit 20, and shows "Tons carried, tonnage per mile and percentage of expenses for the years ending June 30, 1891, 1892 and 1893 (Nebraska)." These exhibits are as follows:

*530
 Exhibit "4."
 Estimate of Local Business and the Effect of House Roll 33 on the Following-named Railroads:
===========================================================================================================================================================
 | | | | | | Amount | |
 | Number of | Average amount | Total amount | Total amount | Amount | received for | Total amount | Per cent of
 1892. | tons hauled | received for | received for | of reduction | received from | freight hauled in | realized on all | reduction on all
 | locally. | each ton hauled. | tons hauled | caused by | passenger | Nebraska including | business done | business done
 | | | locally. | H.R. 33. | business. | through | in the State. | in the State
 | | | | | | and local. | | by H.R. 33.
-------------------|-------------|------------------|--------------|--------------|---------------|--------------------|-----------------|-----------------
Burlington Co... | 574,653 | $2.15416 | $1,237,884 | $365,175 | $2,369,714 | $5,538,766 | $7,908,242 | .044
St. Paul Co... . | 65,762 | 1.87089 | 123,033 | 36,294 | 263,458 | 472,051 | 763,509 | .047
Fremont Co. ... | 158,350 | 2.12633 | 336,714 | 99,310 | 598,219 | 1,495,468 | 2,093,687 | .047
Union Pacific Co. | 192,865 | 2.06498 | 398,262 | 117,487 | 977,264 | 4,284,793 | 5,262,057 | .022
Omaha Co. ... . | 63,999 | 1.38026 | 88,335 | 26,043 | 305,668 | 955,626 | 1,261,294 | .022
St. Joseph Co... | 39,657 | .63051 | 31,004 | 8,836 | 71,083 | 216,395 | 287,478 | .030
Kansas City Co. . | 10,823 | .61261 | 6,630 | 1,889 | 41,123 | 125,530 | 166,653 | .011
===========================================================================================================================================================

*531
 Exhibit "19."
 Estimate of Local Business and the Effect of House Roll 33 on the Following-named Railroads for the
 Years ending June 30, 1891 and 1893.
=================================================================================================================================================================
 | | | | | | Amount | |
 | Number of | Average amount | Total amount | Total amount | Amount | received from | Total amount | Per cent of
 | tons hauled | received per | received per | of reduction | received from | freight carried | received on all | reduction on all
 | locally. | each ton hauled. | ton [for tons] | caused by | passenger | in Nebraska including | business done | business done
 | | | carried locally. | H.R. 33. | business. | local | in the State. | in the State
 | | | | | | and through. | | by H.R. 33.
------------------|-------------|------------------|------------------|--------------|---------------|-----------------------|-----------------|-----------------
 1891. | | | | | | | |
 | | | | | | | |
Burlington Co. . | 538,824 | $1.98 | $1,066,871 | $314,726 | $2,321,983 | $3,942,078 | $6,264,061 | .05
St. Paul Co. . . | 64,496 | 1.72 | 110,933 | 37,725 | 225,264 | 506,470 | 731,734 | .044
Fremont Co... . | 141,056 | 2.47 | 348,408 | 102,780 | 876,583 | 1,969,242 | 2,845,825 | .036
Union Pacific Co. | 152,028 | 1.83 | 278,211 | 82,072 | 1,509,331 | 3,791,849 | 5,301,108 | .015
Omaha Co... . . | 61,448 | 1.23 | 75,581 | 22,296 | 311,130 | 580,834 | 891,964 | .025
St. Joseph Co. . | 25,078 | .87 | 21,817 | 6,245 | 86,036 | 178,529 | 264,565 | .024
Kansas City Co. . | 8,743 | .77 | 6,732 | 1,985 | 41,837 | 67,946 | 109,783 | .018
 | | | | | | | |
 1893. | | | | | | | |
 | | | | | | | |
Burlington Co. . | 583,294 | 2.13 | 1,242,416 | 366,512 | 2,581,564 | 5,973,356 | 8,554,920 | .042
St. Paul Co. . . | 78,753 | 1.81 | 142,542 | 42,049 | 267,535 | 650,109 | 917,644 | .045
Fremont Co... . | 177,804 | 2.26 | 424,437 | 125,208 | 816,239 | 2,237,044 | 3,053,283 | .041
Union Pacific Co. | 220,061 | 1.88 | 413,714 | 122,045 | 1,551,877 | 4,313,204 | 5,865,081 | .020
Omaha Co... . . | 68,237 | 1.18 | 80,519 | 23,753 | 332,497 | 887,616 | 1,220,113 | .019
St. Joseph Co. . | 50,452 | .67 | 33,802 | 9,971 | 99,396 | 263,516 | 362,912 | .027
Kansas City Co. . | 15,485 | .61 | 9,445 | 2,786 | 41,667 | 135,824 | 177,491 | .015
=================================================================================================================================================================

*532
 Exhibit "20."
 Tons carried, Tonnage per Mile and Percentage of Expenses for Years ending June 30, 1891, 1892 and 1893
 (Nebraska).
==============================================================================================================================================================
 | | | | | | Total number |
 | | Number of | Number of | Number of tons | Total number | of passengers, | Percentage
 NAME OF ROAD. | Number of | tons of interstate | tons of local | of interstate | of tons, local and | local and interstate, | of expenses to
 | tons carried | freight | freight carried | freight carried | interstate, | carried | earnings.
 | locally. | carried. | 1 mile. | 1 mile. | carried 1 mile. | 1 mile. |
------------------------|--------------|--------------------|------------------|-----------------|--------------------|-----------------------|---------------
 | | | | | | |
 1891. | | | | | | |
 | | | | | | |
Burlington Co. ... . | 538,824 | 1,448,229 | 73,075,310 | 106,415,962 | 269,491,272 | 69,594,747 | 66.24
St. Paul Co. ... . . | 64,496 | 228,671 | 10,267,118 | 36,397,629 | 46,664,747 | 7,403,263 | 70.78
Fremont Co... ... . | 141,056 | 654,400 | 21,863,680 | 101,644,999 | 123,508,679 | 24,898,729 | 49.87
Union Pacific Co... . | 152,028 | 1,908,045 | 28,908,124 | 362,966,694 | 391,874,818 | 66,072,597 | 68.94
Omaha Co... ... . . | 61,448 | 409,270 | 4,579,104 | 30,499,041 | 35,078,145 | 10,295,137 | 120.26
St. Joseph Co. ... . | 25,078 | 178,169 | 1,497,658 | 10,640,979 | 12,138,637 | 2,308,918 | 96.44
Kansas City Co... . . | 8,743 | 78,694 | 403,751 | 3,634,082 | 4,037,833 | 912,210 | 99.54
 | | | | | | |
 1892. | | | | | | |
 | | | | | | |
Burlington Co. ... . | 574,653 | 1,996,437 | 91,139,965 | 316,552,193 | 407,692,158 | 70,038,243 | 64.23
St. Paul Co. ... . . | 65,762 | 264,403 | 11,028,287 | 44,321,384 | 55,349,671 | 8,833,405 | 65.96
Fremont Co... ... . | 158,350 | 846,312 | 24,069,200 | 128,425,903 | 152,495,103 | 21,874,987 | 70.71
Union Pacific Co... . | 192,865 | 1,882,112 | 42,970,322 | 419,300,773 | 462,271,095 | 56,926,269 | 56.44
Omaha Co... ... . . | 63,999 | 628,351 | 4,659,127 | 45,745,647 | 50,404,774 | 10,058,442 | 93.12
St. Joseph Co. ... . | 39,657 | 303,550 | 2,005,851 | 15,355,015 | 17,360,866 | 2,472,538 | 74.23
Kansas City Co... . . | 10,823 | 194,089 | 481,515 | 8,635,016 | 9,116,531 | 864,030 | 75.19
 | | | | | | |
 1893. | | | | | | |
 | | | | | | |
Burlington Co. ... . | 583,294 | 2,221,005 | 93,703,675 | 357,131,753 | 450,925,428 | 83,091,418 | 65.51
St. Paul Co. ... . . | 78,753 | 279,218 | 12,848,551 | 45,554,417 | 58,402,968 | 9,074,093 | 64.58
Fremont Co... ... . | 187,804 | 800,158 | 26,855,972 | 114,511,328 | 141,367,300 | 23,209,212 | 53.66
Union Pacific Co... . | 220,061 | 2,068,568 | 45,948,736 | 431,949,561 | 477,898,297 | 63,422,117 | 58.51
Omaha Co... ... . . | 68,237 | 683,868 | 4,257,988 | 42,706,297 | 46,964,285 | 11,028,131 | 94.14
St. Joseph Co. ... . | 50,452 | 337,647 | 2,774,860 | 18,576,845 | 21,351,705 | 2,834,169 | 62.05
Kansas City Co... . . | 15,484 | 205,725 | 658,534 | 8,750,126 | 9,408,660 | 875,415 | 76.50
==============================================================================================================================================================

*533 It may be here stated that the words in these exhibits, "number of tons hauled locally," refer to freight that started and ended in the State; the words in Exhibit 4, "amount received for freight hauled in Nebraska, including through and local," and the like words in Exhibit 19, refer not only to freight starting and ending in the State, but to all freight hauled by the railroad company in Nebraska, regardless of its destination or origin  that is, "freight that begins in the State and goes out of the State, freight that begins out of the State and comes into the State and freight which begins and ends in the State." The words, "per cent of reduction on all the business done in the State by House Roll 33," in Exhibits 4 and 19, mean the percentage of the total amount of all business, passenger and freight, done in the State, whatever its origin or destination, and do not indicate the percentage of reduction on local business when considered alone. It should be stated also that the words, "percentage of expenses to earnings," in Exhibit 20, refer to all business, through and local, done by the railroad company within the State. Mr. Dilworth, as we have seen, testified that if the local business alone were considered, the percentage of expenses to earnings upon such business would be at least ten per cent more than the general percentage of expenses to earnings on all business, both through and local. It is important here to note that his estimates are of business from July 1st to the succeeding June 30th. So that when allusion is made presently to his estimates for 1891, 1892 and 1893, it will be understood to refer to the years ending the 30th days of June, 1891, 1892 and 1893, respectively.
From July 1, 1890, to June 30, 1891, as shown by Exhibit 20, the percentage of expenses to earnings on all business on the Burlington road was 66.24; on the St. Paul road, 70.78; on the Fremont road, 49.87; on the Union Pacific road, 68.94; on the Omaha road, 120.26; on the St. Joseph road, 96.44; and on the Kansas City road, 99.54;
From July 1, 1891, to June 30, 1892, as shown by the same Exhibit, the percentage of expenses to earnings on all business on the Burlington road was 64.23; on the St. Paul *534 road, 65.96; on the Fremont road, 70.71; on the Union Pacific road, 56.44; on the Omaha road, 93.12; on the St. Joseph road, 74.23; and on the Kansas City road, 75.19; and,
From July 1, 1892, to June 30, 1893, as shown by the same Exhibit, the percentage of expenses to earnings on all business on the Burlington road was 65.51; on the St. Paul road, 64.58; on the Fremont road, 53.66; on the Union Pacific road, 58.51; on the Omaha road, 94.14; on the St. Joseph road, 62.05; and on the Kansas City road, 76.50.
In view of the reduction of 29.50 in rates prescribed by the statute and of the extra cost of doing local business, as compared with other business, what do these facts show?
Take the case of the Burlington road from July 1, 1890, to June 30, 1891. Looking at the entire business done on it during that period within the limits of the State, we find that the percentage of operating expenses to earnings on all business  which, as stated, does not include the extra cost of local business  was 66.24. Add to this the extra cost of local business, estimated at at least ten per cent, and the result is that, under the rates charged during the period stated, the cost to the Burlington Company of earning $100 would have been $76.24. Now, if the reduction of 29½ per cent made by the act of 1893 had been in force prior to July 1, 1891, the company would have received $70.50 as against $100 for the same service, showing that in that year the operating expenses would have exceeded the earnings by $5.74 in every $100 of the amount actually received by it.
By like calculations, it will appear that each of the railroad companies would have conducted its local business at a loss during the periods stated, except that in the year ending June 30, 1891, and in the year ending June 30, 1893, the earnings of the Fremont Company, and in the years ending the 30th days of June, 1892 and 1893, respectively, the earnings of the Union Pacific Company, would have slightly exceeded their operating expenses.
Under the rates prescribed by the act of 1893 the cost to the respective companies of local business in Nebraska would have exceeded the earnings for the years ending June 30, *535 1891, 1892 and 1893, respectively, in every one hundred dollars of the amount actually received, as follows: To the Burlington Company, by $5.74, $3.73 and $5.01; to the St. Paul Company, by $10.28, $5.46 and $4.08; to the Omaha Company, by $59.76, $32.62 and $33.64; to the St. Joseph Company, by $35.94, $13.73 and $1.55; and to the Kansas City Company, by $39.04, $14.69 and $16. The cost to the Union Pacific Company for the year ending June 30, 1891, of its local business, under the rates prescribed by the statute of 1893, would have caused a loss of $8.44 in every one hundred dollars of the amount actually received.
In order to show these results at a glance, the table on page 536 is inserted upon the basis of one hundred as representing the amounts actually charged and received by the respective railroad companies for the years given.
There are other views of the case suggested by the above exhibits and table which show the same results.
In the year ending June 30, 1891, under the rates then in force, the Burlington Company received $1,066,871 for tons carried locally. If the business had been done under the rates prescribed by the act of 1893, it would have received 29½ per cent less, that is, only $752,145 or $314,726 less than it did receive. The percentage of expenses to earnings, including the extra cost of local business, was 76.24; that is, it cost $813,382 to earn $1,066,871. So that the difference between $813,382 and $752,145 shows that, if the rates prescribed by the statute of 1893 had been in force during the year ending June 30, 1891, the amount received would have been less than the operating expenses of the Burlington Company by $61,237.
During the year ending June 30, 1892, the same company received for tons carried locally $1,237,884. If the act of 1893 had been in force, it would have received, because of the reduced rates prescribed by that act, only $872,709  less by $365,175 than it did receive. The percentage of expenses to earnings, including the extra cost of local business, was 74.23; that is, the $872,709 would have been earned at a cost of $918,881. So that under the rates prescribed by the act

*536
==============================================================================================================================
 | Cost by percentage | Extra cost of local | Total cost of local | Earnings as reduced | |
 NAME. | of all business. | business. | business. | by act of 1893. | Loss. | Gain.
------------------------|--------------------|---------------------|---------------------|---------------------|-------|------
 1891. | | | | | |
 | | | | | |
Burlington Company . . | 66.24 | 10 | 76.24 | 70.50 | 5.74 |
St. Paul Company ... | 70.78 | 10 | 80.78 | 70.50 | 10.28 |
Fremont Company ... . | 49.87 | 10 | 59.87 | 70.50 | ... | 10.63
Union Pacific Company . | 68.94 | 10 | 78.94 | 70.50 | 8.44 |
Omaha Company ... . . | 120.26 | 10 | 130.26 | 70.50 | 59.76 |
St. Joseph Company . . | 96.44 | 10 | 106.44 | 70.50 | 35.94 |
Kansas City Company . . | 99.54 | 10 | 109.54 | 70.50 | 39.04 |
 | | | | | |
 1892. | | | | | |
 | | | | | |
Burlington Company . . | 64.23 | 10 | 74.23 | 70.50 | 3.73 |
St. Paul Company ... | 65.96 | 10 | 75.96 | 70.50 | 5.46 |
Fremont Company ... . | 70.71 | 10 | 80.71 | 70.50 | 10.21 |
Union Pacific Company . | 56.44 | 10 | 66.44 | 70.50 | ... | 4.06
Omaha Company ... . . | 93.12 | 10 | 103.12 | 70.50 | 32.62 |
St. Joseph Company . . | 74.23 | 10 | 84.23 | 70.50 | 13.73 |
Kansas City Company . . | 75.19 | 10 | 85.19 | 70.50 | 14.69 |
 | | | | | |
 1893. | | | | | |
 | | | | | |
Burlington Company . . | 65.51 | 10 | 75.51 | 70.50 | 5.01 |
St. Paul Company ... | 64.58 | 10 | 74.58 | 70.50 | 4.08 |
Fremont Company ... . | 53.66 | 10 | 63.66 | 70.50 | ... | 6.84
Union Pacific Company . | 58.51 | 10 | 68.51 | 70.50 | ... | 1.99
Omaha Company ... . . | 94.14 | 10 | 104.14 | 70.50 | 33.64 |
St. Joseph Company . . | 62.05 | 10 | 72.05 | 70.50 | 1.55 |
Kansas City Company . . | 76.50 | 10 | 86.50 | 70.50 | 16.00 |
==============================================================================================================================

of 1893 the loss during the period named would have been $46,172.
During the year ending June 30, 1893, that company received $1,242,416 for tons carried locally; whereas, under the 29½ per cent reduction prescribed by the statute of that year, it would have received only $875,905, that is, less by $366,512 than it did receive. The percentage of its expenses to earnings in that year, including the extra cost of local business, was 75.51; that is, under the statutory rates $875,905 would have been earned at a cost of $938,147; which would have been a loss of $62,243.
*537 By the same mode of calculation, it will be found that, if the statute of 1893 had been enforced during the years ending the 30th days of June, 1891, 1892 and 1893, respectively, the other companies would have lost, that is, their expenses would have exceeded their earnings during those years by the following amounts: The St. Paul Company, $11,403, $6716 and $5814; the Fremont Company, $34,377 for the year ending June 30, 1892; the Union Pacific Company, $23,480, for the year ending June 30, 1891; the Omaha Company, $45,166, $28,813 and $27,085; the St. Joseph Company, $7840, $4256 and $523; and the Kansas City Company, $2627, $974 and $1510; while the earnings of the Union Pacific Company would have exceeded its expenses for the years ending the 30th days of June, 1892 and 1893, respectively, by $16,170 and $8234; and those of the Fremont Company by $37,037 and $29,036 for the years ending the 30th days of June, 1891 and 1893, respectively.
These results will be seen in the table on page 538, based upon the above exhibits, and assuming that 10 per cent was the very lowest amount of the extra cost of business beginning and ending in the State.
Counsel for the appellants contend that the railroad companies in Nebraska derived a profit from their local tonnage of nearly 100 per cent over and above operating expenses. This contention is based upon the evidence given by William Randall, freight and ticket agent as well as auditor of the Burlington road in Nebraska, on his first examination as a witness. He then stated that the earnings of the company for the year 1892  meaning for the year beginning January 1, 1892  upon freight starting and ending within the State were $1,853,036.59, and that the operating expenses, including taxes, on that business were $972,183.70. These figures, counsel say, show that "there was a clear profit over operating expenses, including taxes, of nearly one hundred per cent on the local business of the Burlington Company in 1892." But counsel overlook the fact that, upon his second examination, Mr. Randall stated that his first figures were not correct, and that the operating expenses on local business in 1892 were

*538
==========================================================================================================================================================
 | | | What would | Amount to be | Amount to be | | |
 | Total amount | Total amount | have been received | deducted to pay | taken out of | | |
 | received for | of reduction by | under | expenses (reckoned | earnings to pay | Total expense | Gain. | Loss.
 NAME OF ROAD | tons carried | act of 1893, 29½ | rates fixed by | by per | 10 per cent extra | of local business. | |
 | locally. | per cent. | act of 1893. | cent of cost of | cost of local | | |
 | | | | all business). | business. | | |
------------------|--------------|------------------|--------------------|--------------------|-------------------|--------------------|---------|--------
 | | | | | | | |
 1891. | | | | | | | |
 | | | | | | | |
Burlington Co. . | $1,066,871 | $314,726 | $752,145 | $706,695 | $106,687 | $813,382 | ... | $61,237
St. Paul Co. . . | 110,933 | 32,725 | 78,208 | 78,518 | 11,093 | 89,611 | ... | 11,403
Fremont Co... . | 348,408 | 102,780 | 245,628 | 173,751 | 34,840 | 208,591 | $37,037 | ...
Union Pacific Co. | 278,211 | 82,072 | 196,139 | 191,798 | 27,821 | 219,619 | ... | 23,480
Omaha Co... . . | 75,581 | 22,296 | 53,285 | 90,893 | 7,558 | 98,451 | ... | 45,166
St. Joseph Co. . | 21,817 | 6,436 | 15,381 | 21,040 | 2,181 | 23,221 | ... | 7,840
Kansas City Co. . | 6,732 | 1,985 | 4,747 | 6,701 | 673 | 7,374 | ... | 2,627
 | | | | | | | |
 1892. | | | | | | | |
 | | | | | | | |
Burlington Co. . | 1,237,884 | 365,175 | 872,709 | 795,093 | 123,788 | 918,881 | ... | 46,172
St. Paul Co. . . | 123,033 | 36,294 | 86,739 | 81,152 | 12,303 | 93,455 | ... | 6,716
Fremont Co... . | 336,714 | 99,330 | 237,384 | 238,090 | 33,671 | 271,761 | ... | 34,377
Union Pacific Co. | 398,262 | 117,487 | 280,775 | 224,779 | 39,826 | 264,605 | 16,170 | ...
Omaha Co... . . | 88,335 | 26,058 | 62,277 | 82,257 | 8,833 | 91,090 | ... | 28,813
St. Joseph Co. . | 31,004 | 9,146 | 21,858 | 23,014 | 3,100 | 26,114 | ... | 4,256
Kansas City Co. . | 6,630 | 1,955 | 4,674 | 4,985 | 663 | 5,648 | ... | 974
 | | | | | | | |
 1893. | | | | | | | |
 | | | | | | | |
Burlington Co. . | 1,242,416 | 366,512 | 875,904 | 813,906 | 124,241 | 938,147 | ... | 62,243
St. Paul Co. . . | 142,542 | 42,049 | 100,493 | 92,053 | 14,254 | 106,307 | ... | 5,814
Fremont Co... . | 424,437 | 125,208 | 299,229 | 227,750 | 42,443 | 270,193 | 29,036 | ...
Union Pacific Co. | 413,714 | 122,045 | 291,669 | 242,064 | 41,371 | 283,435 | 8,234 | ...
Omaha Co... . . | 80,519 | 23,753 | 56,766 | 75,800 | 8,051 | 83,851 | ... | 27,085
St. Joseph Co. . | 33,802 | 9,971 | 23,831 | 20,974 | 3,380 | 24,354 | ... | 523
Kansas City Co. . | 9,445 | 2,786 | 6,659 | 7,225 | 944 | 8,169 | ... | 1,510
==========================================================================================================================================================

*539 $1,221,742.84, and not $972,183.70. This agrees with the figures given by Mr. Taylor, another auditor of the Burlington Company. Now, if the act of 1893 had been in force during 1892, the earnings in the latter year, $1,853,036.59, would have been reduced by 29½ per cent, that is, by $546,645.79, leaving $1,306,390.80 as the total receipts on local business, which, after deducting operating expenses, $1,221,742.84, would leave a profit of $84,567.97. If, as counsel for appellees contend, 10 per cent be added as the extra cost of local business, the result would show an actual loss on that business during the whole of 1892. But if that mode of calculation be not adopted, the utmost that can be said to be established by the evidence of Taylor and Randall would be that if the rates fixed by the act of 1893 had been in force during 1892, the company would have received on local business, in the latter year, $84,647.96 over and above operating expenses, or a little over 6 per cent of the amount of those expenses. The difference between the figures of Dilworth and Taylor and Randall, as to the earnings of the Burlington Company, arises, so far as we can perceive, from the fact that their calculations cover different periods. Dilworth gave the earnings from July 1, 1891, to June 30, 1892, and speaks of them as the earnings for 1892, while Taylor and Randall gave the earnings from January 1, 1892, to December 31, 1892. There may have been an unusual amount of business during the last six months of 1892 embraced in the estimates of Taylor and Randall, and not embraced by Dilworth's estimates. We cannot, therefore, say that the testimony of Taylor and Randall overthrows the estimates of Dilworth.
It is said by the appellants that the local rates established by the Nebraska statute are much higher than in the State of Iowa, and that fact shows that the Nebraska rates are reasonable. This contention was thus met by the Circuit Court: "It is, however, urged by the defendants that, in the general tariffs of these companies, there is an inequality; that the rates in Nebraska are higher than those in adjoining States, and that the reduction by House Roll 33 simply establishes an equality between Nebraska and the other States through *540 which the roads run. The question is asked, Are not the people of Nebraska entitled to as cheap rates as the people of Iowa? Of course, relatively they are. That is, the roads may not discriminate against the people of any one State, but they are not necessarily bound to give absolutely the same rates to the people of all the States; for the kind and amount of business and the cost thereof are factors which determine largely the question of rates, and these vary in the several States. The volume of business in one State may be greater per mile, while the cost of construction and of maintenance is less. Hence, to enforce the same rates in both States might result in one in great injustice, while in the other it would only be reasonable and fair. Comparisons, therefore, between the rates of two States are of little value, unless all the elements that enter into the problem are presented. It may be true, as testified by some of the witnesses, that the existing local rates in Nebraska are 40 per cent higher than similar rates in the State of Iowa. But it is also true that the mileage earnings in Iowa are greater than in Nebraska. In Iowa there are 230 people to each mile of railroad, while in Nebraska there are but 190; and, as a general rule, the more people there are the more business there is. Hence, a mere difference between the rates in two States is of comparatively little significance." 64 Fed. Rep. 165. In these views we concur, and it is unnecessary to add anything to what was said by the Circuit Court on this point.
It is further said, in behalf of the appellants, that the reasonableness of the rates established by the Nebraska statute is not to be determined by the inquiry whether such rates would leave a reasonable net profit from the local business affected thereby, but that the court should take into consideration, among other things, the whole business of the company, that is, all its business, passenger and freight, interstate and domestic. If it be found upon investigation that the profits derived by a railroad company from its interstate business alone are sufficient to cover operating expenses on its entire line, and also to meet interest, and justify a liberal dividend upon its stock, may the legislature prescribe rates for domestic *541 business that would bring no reward and be less than the services rendered are reasonably worth? Or, must the rates for such transportation as begins and ends in the State be established with reference solely to the amount of business done by the carrier wholly within such State, to the cost of doing such local business, and to the fair value of the property used in conducting it, without taking into consideration the amount and cost of its interstate business, and the value of the property employed in it? If we do not misapprehend counsel, their argument leads to the conclusion that the State of Nebraska could legally require local freight business to be conducted even at an actual loss, if the company earned on its interstate business enough to give it just compensation in respect of its entire line and all its business, interstate and domestic. We cannot concur in this view. In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a State for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it. The State cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the State has no control. Nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business. It is only rates for the transportation of persons and property between points within the State that the State can prescribe; and when it undertakes to prescribe rates not to be exceeded by the carrier, it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect of domestic business. The argument that a railroad line is an entirety; that its income goes into, and its expenses are provided for, out of a common fund; and that its capitalization is on its entire line, within and without *542 the State, can have no application where the State is without authority over rates on the entire line, and can only deal with local rates and make such regulations as are necessary to give just compensation on local business.
Touching the suggestion that the reduction on rates made by the state law was reasonable, if regard be had to all the business, through and local, done in the State by the railroad companies, the Circuit Court said:
"But again, as Mr. Dilworth testified, the average reduction on local rates caused by House Roll 33 is 29½ per cent. The tariff which was in force at the time of the passage of this act had been, for some three or more years, fixed by the voluntary action of the railroad companies, and the reduction of 29½ per cent was from their rates. It must be remembered that these roads are competing roads; that competition tends to a reduction of rates  sometimes, as the history of the country has shown, below that which affords any remuneration to those who own the property. Can it be possible that any business so carried on can suffer a reduction of 29½ per cent in its receipts without ruin? What would any business man, engaged in any business of a private character, think of a compulsory reduction of his receipts to the amount of 29½ per cent? The effect of this testimony is not destroyed by the table offered of the percentage of reduction on the total amount of business done by these companies in the State as follows:

 "B. & M. R. ............................ 4.2 per cent.
 "C., St. P., M. & O. ................... 4.5 per cent.
 "F., E. &. M. B. ....................... 4.1 per cent.
 "Union Pacific ......................... 2.0 per cent.
 "O. & R. V. ............................ 1.9 per cent.
 "St. J. & G. I. ........................ 2.7 per cent.
 "K. C. & O. ............................ 1.5 per cent.

"For such a table only indicates, as is further shown by Defendants' Exhibit 4, how small a proportion of the total amount of business done in the State comes from purely local freight. Nor is it weakened by any comparison between the amount of reduction and the total receipts from all business. *543 It may be, as stated by counsel, that the annual earnings of the Chicago, Burlington and Quincy Company are $27,916,128, and that the total amount of reduction caused by this House Roll 33 is only $365,175. It may be that the capital stock of the company is $76,407,500, and that $365,175 distributed among the stockholders may not be for any of them a great sum; but the entire earnings of the C., B. & Q. are more than twenty times the receipts from local freight in Nebraska; and to reduce such earnings by twenty times $365,175 would make a startling difference in their amount. The fact that the State of Nebraska can reach only one twentieth of the total earnings, gives it no greater right to make a reduction in respect to that one twentieth than it would have, had it the power over the total earnings, and attempted in them a like per cent of reduction. If it would be unreasonable to reduce the total earnings of these roads 29½ per cent, it is at least, prima facie, equally unreasonable to so reduce any single fractional part of such earnings."
It appears, from what has been said, that if the rates prescribed by the act of 1893 had been in force during the years ending June 30, 1891, 1892 and 1893, the Fremont Company, in the years ending June 30, 1891, and June 30, 1893, and the Union Pacific Company, in the years ending June 30, 1892, and June 30, 1893, would each have received more than enough to pay operating expenses. Do those facts affect the general conclusion as to the probable effect of the act of 1893? In the discussion of this question, the plaintiffs contended that a railroad company is entitled to exact such charges for transportation as will enable it, at all times, not only to pay operating expenses, but also to meet the interest regularly accruing upon all its outstanding obligations, and justify a dividend upon all its stock; and that to prohibit it from maintaining rates or charges for transportation adequate to all those ends will deprive it of its property without due process of law, and deny to it the equal protection of the laws. This contention was the subject of elaborate discussion; and, as it bears upon each case in its important aspects, it should not be passed without examination.
*544 In our opinion, the broad proposition advanced by counsel involves some misconception of the relations between the public and a railroad corporation. It is unsound in that it practically excludes from consideration the fair value of the property used, omits altogether any consideration of the right of the public to be exempt from unreasonable exactions, and makes the interests of the corporation maintaining a public highway the sole test in determining whether the rates established by or for it are such as may be rightfully prescribed as between it and the public. A railroad is a public highway, and none the less so because constructed and maintained through the agency of a corporation deriving its existence and powers from the State. Such a corporation was created for public purposes. It performs a function of the State. Its authority to exercise the right of eminent domain and to charge tolls was given primarily for the benefit of the public. It is, under governmental control though such control must be exercised with due regard to the constitutional guarantees for the protection of its property. Olcott v. The Supervisors, 16 Wall. 678, 694; Sinking Fund cases, 99 U.S. 700, 719; Cherokee Nation v. Southern Kansas Railway, 135 U.S. 641, 657. It cannot, therefore, be admitted that a railroad corporation maintaining a highway under the authority of the State may fix its rates with a view solely to its own interests, and ignore the rights of the public. But the rights of the public would be ignored if rates for the transportation of persons or property on a railroad are exacted without reference to the fair value of the property used for the public or the fair value of the services rendered, but in order simply that the corporation may meet operating expenses, pay the interest on its obligations, and declare a dividend to stockholders.
If a railroad corporation has bonded its property for an amount that exceeds its fair value, or if its capitalization is largely fictitious, it may not impose upon the public the burden of such increased rates as may be required for the purpose of realizing profits upon such excessive valuation or fictitious capitalization; and the apparent value of the property and franchises used by the corporation, as represented by its *545 stocks, bonds and obligations, is not alone to be considered when determining the rates that may be reasonably charged. What was said in Covington & Lexington Turnpike Road Co. v. Sandford, 164 U.S. 578, 596-7, is pertinent to the question under consideration. It was there observed: "It cannot be said that a corporation is entitled, as of right, and without reference to the interests of the public, to realize a given per cent upon its capital stock. When the question arises whether the legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and its stockholders. But that involves an inquiry as to what is reasonable and just for the public... . The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends. The legislature has the authority, in every case, where its power has not been restrained by contract, to proceed upon the ground that the public may not rightfully be required to submit to unreasonable exactions for the use of a public highway established and maintained under legislative authority. If a corporation cannot maintain such a highway and earn dividends for stockholders, it is a misfortune for it and them which the Constitution does not require to be remedied by imposing unjust burdens upon the public. So that the right of the public to use the defendant's turnpike upon payment of such tolls as in view of the nature and value of the services rendered by the company are reasonable, is an element in the general inquiry whether the rates established by law are unjust and unreasonable."
A corporation maintaining a public highway, although it owns the property it employs for accomplishing public objects, must be held to have accepted its rights, privileges and franchises subject to the condition that the government creating it, or the government within whose limits it conducts its business, may by legislation protect the people against unreasonable *546 charges for the services rendered by it. It cannot be assumed that any railroad corporation, accepting franchises, rights and privileges at the hands of the public, ever supposed that it acquired, or that it was intended to grant to it, the power to construct and maintain a public highway simply for its benefit, without regard to the rights of the public. But it is equally true that the corporation performing such public services and the people financially interested in its business and affairs have rights that may not be invaded by legislative enactment in disregard of the fundamental guarantees for the protection of property. The corporation may not be required to use its property for the benefit of the public without receiving just compensation for the services rendered by it. How such compensation may be ascertained, and what are the necessary elements in such an inquiry, will always be an embarrassing question. As said in the case last cited: "Each case must depend upon its special facts; and when a court, without assuming itself to prescribe rates, is required to determine whether the rates prescribed by the legislature for a corporation controlling a public highway are, as an entirety, so unjust as to destroy the value of its property for all the purposes for which it was acquired, its duty is to take into consideration the interests both of the public and of the owner of the property, together with all other circumstances that are fairly to be considered in determining whether the legislature has, under the guise of regulating rates, exceeded its constitutional authority, and practically deprived the owner of property without due process of law... . The utmost that any corporation operating a public highway can rightfully demand at the hands of the legislature, when exerting its general powers, is that it receive what, under all the circumstances, is such compensation for the use of its property as will be just both to it and to the public."
We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the *547 original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth. But even upon this basis, and determining the probable effect of the act of 1893 by ascertaining what could have been its effect if it had been in operation during the three years immediately preceding its passage, we perceive no ground on the record for reversing the decree of the Circuit Court. On the contrary, we are of opinion that as to most of the companies in question there would have been, under such rates as were established by the act of 1893, an actual loss in each of the years ending June 30, 1891, 1892 and 1893; and that, in the exceptional cases above stated, when two of the companies would have earned something above operating expenses, in particular years, the receipts or gains, above operating expenses, would have been too small to affect the general conclusion that the act, if enforced, would have deprived each of the railroad companies involved in these suits of the just compensation secured to them by the Constitution. Under the evidence there is no ground for saying that the operating expenses of any of the companies were greater than necessary.
In concluding this opinion, it may not be inappropriate to say that the conclusions reached by us as to the effect of the Nebraska statute find some support in the report of the Board of Secretaries of the Nebraska Board of Transportation made in September, 1891, to the Board itself, and signed by Mr. Dilworth *548 and his colleagues. That report was made pursuant to a resolution of the Board requiring the Secretaries to prepare a statement of facts in reference to the rates of transportation in Nebraska. It contains a brief history of what it characterizes as "the controversy on the question of freight rates between the people and the railroads of the State," and embodies such facts, figures and arguments as the Secretaries gathered from both sides. The report says: "The present controversy between the people and the railroads of this State originally grew out of the question, not of rates or reduction of rates, but of control. The people, recognizing the railroads as common carriers, not entitled under the state constitution to the same broad liberty of action in business that the individual citizen has, wanted to control the roads. The roads, impatient of interference, wanted to control themselves and manage their business in their own way." It further states: "We have given you in the foregoing a brief history of the rate matter as we have found it, and from that history and from the evidence and reports on file in our office we beg leave to submit in conclusion the following findings of fact: First. We find from the evidence and sworn statements and reports, on file in our office, and from personal inspection, that the railroads in this State could not be duplicated for a less sum than $30,000 per mile, taking into consideration their equipments and depot and terminal facilities." Here follow a mass of figures and calculations, and the report concludes: "We further find that the railroads are not in a condition to stand, nor do their earnings, figured on a basis cost of $30,000 per mile and not what they claim they cost, justify any cut in local rates of this State at the present time; and further, that a reduction in the local rates in this State would increase the through rates to market for our grain and would be a blow at the industry of the State. This last finding is fully established by the fact that the Board of Transportation reduced the local rates on hard coal 60 per cent, and yet the price to the consumer was not lowered nor the price at the mines raised, which shows conclusively that the through rates must have been raised. In submitting this report we have presented the facts *549 and figures as we find them from evidence obtainable, from sworn reports now on file in our office. And we would respectfully recommend that no action be taken that will in any way jeopardize the interests of the producers of Nebraska, but that all interests be protected in the fullest manner possible, as provided by the foregoing findings."
To this report of the Secretaries is appended the "Findings of the Board," from which we make this extract: "After a careful and quite thorough investigation of the question of freight rates in Nebraska, which has occupied much time, and has taken a wide range, the state Board of Transportation has arrived at the conclusion that the rates now in force in this State cannot be generally reduced without doing violence to the business interests of the State, and at the same time injuring the shipping and producing classes. We have come to this conclusion, not by taking the cost of construction and equipments, nor the amount of stock and bonds issued per mile, but by making our computations upon the basis of what it would cost to duplicate the property at the present time. It has been our endeavor to deal fairly and justly with the question, and in arriving at a conclusion we have been governed only by the evidence, statements and facts produced for our consideration. A candid examination and comparison of the figures presented to us in the unanimous report of the Board of Secretaries, in the opinion of this Board, fully justifies the conclusion reached: That a general reduction of rates, as now in force over the State, is not practical at this time."
So that we have the judgment of the state Board of Transportation, as constituted in 1891, that a general reduction of rates could not then have been made without injury to the business of the State, to say nothing of the interests of those whose means were invested in railroad property. We are unable to find from the record before us that the situation in Nebraska had so changed in 1893 as to justify that being done in that year which it was not safe or just to do in 1891.
But it may be added that the conditions of business, so far as railroad corporations are concerned, have probably changed *550 for the better since the decree below, and that the rates prescribed by the statute of 1893 may now afford all the compensation to which the railroad companies in Nebraska are entitled as between them and the public. In anticipation, perhaps, of such a change of circumstances, and the exceptional character of the litigation, the Circuit Court wisely provided in its final decree that the defendants, members of the Board of Transportation, might, "when the circumstances have changed so that the rates fixed in the said act of 1893 shall yield to the said companies reasonable compensation for the services aforesaid," apply to the court, by bill or otherwise as they might be advised, for a further order in that behalf. Of this provision of the final decree the state Board of Transportation, if so advised, can avail itself. In that event, if the Circuit Court finds that the present condition of business is such as to admit of the application of the statute to the railroad companies in question without depriving them of just compensation, it will be its duty to discharge the injunction heretofore granted, and to make whatever order is necessary to remove any obstruction placed by the decrees in these cases in the way of the enforcement of the statute.
Perceiving no error on the record in the light of the facts presented to the Circuit Court,
The decree in each case must be affirmed.
The CHIEF JUSTICE took no part in the consideration or decision of these cases.
MR. JUSTICE McKENNA was not a member of the court when they were argued and submitted, and took no part in their decision.