## PEOPLE OF PORTO RICO, Plff.,

*v.*

## AMERICAN RAILROAD COMPANY of Porto Rico, Dft.

---

San Juan, Equity, No. 992.

REGULATION OF RAILROAD RATES.

Statutory Laws of the United States—Contiguous Territories—Interstate Commerce Act and Similar Legislation—Power of Congress—Limitation.

1. The statutory laws of the United States not locally inapplicable have the same force and effect in Porto Rico as in the United States. Porto Rico is a territory with different rights and duties from those of the territories contiguous to the original states within the continental limits of the United States. The said territories were formed in accordance with the general system embodied in §§ 1839–1895 of the Revised Statutes of the United States. With the acquisi-

## People v. American Railroad Co.

tion of Alaska, Hawaii, Porto Rico, and the Philippines, the system has undergone a change, as each of these has called for a special act. The United States can acquire territory which will not be incorporated into the Union until Congress so specially enacts. Porto Rico was subject to the Interstate Commerce Act and similar legislation until specifically excepted by the Jones Act of March 2, 1917. It is clearly the intention of Congress to give Porto Rico full power of local legislation, subject to disallowance, but to retain national affairs under its own control. Under the war and treaty clauses of the Constitution, the nation can acquire new territory which is absolutely subject to the will of Congress, except that it must respect the fundamental principles of the Constitution relating to what are ordinarily called the rights of man.

Interstate Commerce Act and Amendments—Applicability to Porto Rico— Hepburn Act—Jones Act.

2. The Interstate Commerce Act of February 4, 1887, and amendments, regulated commerce between the states. The Act of June 29, 1906, the so-called Hepburn Act, made it applicable to Porto Rico, and it remained so until the Jones Act of March 2, 1917, made it inapplicable. While the existing schedules of the railroad were not filed with the Interstate Commerce Commission, they were filed with and approved by the Executive Council in 1907, and have since then been acted upon by the railroad and the public without complaint. The action of the Executive Council will be considered as having been ratified by the Interstate Commerce Commission.

Porto Rican Legislature—Act of March 12, 1908—Hepburn Act—Inconsistency—Acquiescence—Void Laws.

3. The Act of March 12, 1908, of the Porto Rican legislature and the Hepburn Act are inconsistent with each other, and the provisions of the latter must prevail. Acquiescence by Congress will not be inferred from length of time, as it does not need to disapprove a law which is void.

Suspension of Laws—State Legislation—Porto Rican Legislation.

4. A state law may survive a temporary regulation by Congress on the same subject, and this is based upon the principle that the state is a sovereign while the acts of the Porto Rican legislature are subordinate to legislation by Congress itself. When Congress acts upon a subject, local legislation on the same subject is not suspended, but rendered ineffective. The Act of 1908 of the Porto Rican legislature, in so far as it covered the same ground as the Act of Congress of 1906, was never in effect.

People v. American Railroad Co.

Porto Rican Legislature—Acts of Congress—Inconsistency—Foraker Act—
Constitutional Limitation—Emergencies—Presumption.

5. The local law of 1908 covered many other subjects than rail-
road rates, and to the extent of these other subjects it was a valid
exercise of the power granted by the Foraker Act. But even under
the Foraker Act, apart from the Hepburn Act, Porto Rico was not
authorized to legislate concerning railroad rates. It is doubtful
whether Congress could give the power under the 14th Constitutional
Amendment. The local act is not to be considered as dormant, but
as applying to anything or to any emergency which comes within
its scope, and not within the scope of the Interstate Commerce
Commission. It will not be presumed that no power is granted
to meet emergencies.

Jurisdiction—Submission by Consent—Act of 1908—People of Porto Rico—
Parties.

6. Jurisdiction cannot be conferred by consent, and a submission
to the jurisdiction in the past does not affect present acts. The
Executive Council having jurisdiction under the local act to direct
suits to be brought or proceedings to be taken in the name of the
people of Porto Rico to enforce compliance with its terms, it will be
considered that the people of Porto Rico have an interest in its en-
forcement provided it is shown that an emergency exists.

Opinion filed April 30, 1917.

## Statement of the Pleadings.

This suit was commenced April 25, 1917, by a petition filed
on that date in the local district court at San Juan, praying an
injunction against an increase of freight rates by the defendant
on sugar cane and other products from and after May 1, 1917.
A restraining order was accordingly issued by Honorable José
Benedicto, judge of the local court, and the matter made return-
able on April 28 for further consideration. On April 27 steps
were taken by the defendant, which is a New York corporation,
for removal of the suit to the Federal court, and on April 28 a

People v. American Railroad Co.

motion was made by the defendant to dismiss the bill on the ground that it does not state any matter of equity entitling plaintiff to the relief prayed for, "nor are the facts as stated sufficient to entitle plaintiff to any relief against this defendant."

The pleading, called petition in the local court and bill in this court, avers that defendant filed certain schedules of rates with the Executive Council of Porto Rico in May, 1907, and that they were duly approved by that body. That this schedule was amended October 22, 1908, in so far as the transportation of sugar and molasses is concerned. That in January, 1917, the defendant filed a petition with the Executive Council, asking permission to increase the schedule 20 per cent, and a petition to the same effect was filed on March 5. Hearings were had, but the matter was never finally passed upon. On April 17 the American Railroad Company withdrew the said petitions, and expressed its intention to put into effect a schedule of freight rates for the transportation of sugar cane and its products 20 per cent higher than the one so enforced, without the authority of the Executive Council. That on April 24 the Executive Council passed a resolution ordering the American Railroad Company not to make any change in the said rates for the transportation of sugar cane, sugar, and molasses without the previous approval of the Executive Council, and directing the attorney general to take such judicial steps as may be necessary to prevent such increase. That the American Railroad Company had on April 19 notified shippers that, on account of the high price of coal and other materials, and tendency to further increase, the railroad was compelled to increase 20 per cent on the special tariff for the transportation of sugar cane and its products to be effective May 1, and enclosing a copy of the amended tariff. That publi-

cation to the same effect was made in different newspapers, and copies thereof, dated March 24, are made exhibits to the bill.

The matter before the court, therefore, is the bill, restraining order, and motion to dismiss, which admits the facts stated in the bill, and is meant and is to be taken as a return to the order of the court directed to the defendant to show cause why a preliminary injunction should not issue. The matter was argued and submitted on this basis.

*Mr. Howard L. Kern,* Attorney General, for plaintiff.

*Messrs. Dexter & Almiroty, Chas. Hartzell,* and *H. G. Molina* for defendant.

HAMILTON, Judge, delivered the following opinion:

The questions raised by the pleadings relate to the condition of railroad regulation subsequent to the passage of the new organic act, commonly called the Jones Act, of March 2, 1917, but prior to the first election provided for in said act and necessarily prior to the formation of the Public Service Commission provided for by § 38 of said act, which is to be composed in part of certain officers to be elected at the same time with the legislature, to wit, July 16, 1917. It is contended on behalf of the plaintiff that the subject is covered by the Local Act of March 12, 1908, found in the Compilation of 1911, page 72, while, on the other hand, the defendant contends that this act either was never in force, or has been repealed by the new organic act, and that the so-called national Hepburn Act of June 29, 1906, is by the Jones Act, § 38, expressly declared inapplicable to Porto .

Rico. The solution of this question requires the consideration of several matters.

1. It has been decided by the Supreme Court in American R. Co. Didricksen, 227 U. S. 145, 57 L. ed. 456, 33 Sup. Ct. Rep. 224, and other cases, that Porto Rico is a territory of the United States for the purposes of the safety appliance and similar regulative legislation. As these are merely incidental to commerce, there can be no doubt that what is ordinarily called the Interstate Commerce Act of February 4, 1887, as amended, and the Hepburn Act of June 29, 1909 (34 Stat. at L. 584, chap. 3591, Comp. Stat. 1916, § 8563), likewise applied and apply to Porto Rico so far as not locally inapplicable. This principle was declared in § 14 of the Foraker Act, and is reiterated in § 9 of the Jones Act, as follows: That "the statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Porto Rico as in the United States, except the internal revenue laws." [39 Stat. at L. —, chap. 145, Comp. Stat. —, § 3803 c c c.] It is not necessary for the purposes of this case to discuss the technical relation of Porto Rico to the rest of the Union. It is a territory, and a territory with different rights and duties from the old ones contiguous to the original states within the continental limits of the United States. These were formed under one general plan, originating indeed before the present Union, when what is called the Northwest Territory was ceded by the states in 1787, and more particularly after the acquisition of Louisiana in 1803, Florida in 1819, and Texas and the new Southwest after the Mexican War of 1848. The principles governing such territories were so uniform that they were comprised in one system found in the Revised Statutes of the United

States, §§ 1839–1895, Comp. Stat. 1916, §§ 3425–3430, 3432–
3439, 3442–3444, 3446–3449, 3452–3457, 3459–3468, 3470,
3471, 3473–3475, 3477, 3478, 3489, 3522, 3524–3527. With
the acquisition of Alaska in 1867, Hawaii in 1898, and Porto
Rico and the Philippines in the same year, there has been a
change of system. These possessions, extending from the Arctic
ocean to the tropics in both hemispheres, have called for special
acts in each case. What are called the Insular Cases in Downes
v. Bidwell, 182 U. S. 244, 45 L. ed. 1088, 21 Sup. Ct. Rep.
770, have determined that the United States can acquire ter-
ritory which is not incorporated into the Union until Congress
so specifically enacts. What legislation amounts to such incor-
poration is a question which does not arise in this case. Suffice
it that Porto Rico was subject to the Interstate Commerce Act
and similar legislation until specifically excepted by the Jones
Act of March 2, 1917. So far as relates to Porto Rico, the in-
tention of Congress clearly is to give the people full power of
local legislation, subject to the disallowance by Congress, but to
retain national affairs within the entire power of Congress. The
exact line between the two it may sometimes be difficult to pre-
scribe, just as it has been found difficult in the relations of the
states, which are, as Porto Rico is not, component parts of the
United States. The present is only one of many questions which
are bound to arise growing out of this new system of territorial
organization, and must be approached with the realization of the
wide scope which Congress has chosen to give to the territorial
power. The power of Congress in regard to territories is some-
times referred to article 4, § 3, of the Constitution, which says:
"The Congress shall have power to dispose of and make all need-
ful rules and regulations respecting the territory or other prop-

erty belonging to the United States." On the other hand, there is some reason to think that this referred only to what is called the Northwest Territory, already belonging to the United States, and that the makers of the Constitution did not contemplate further extension of the country's limits. On this view, however, Congress would have even greater powers under the war and treaty clauses of the Constitution. The nation can under these unquestionably acquire new territory, and if, as determined in the Insular Cases, this does not become immediately a part of the Union, it is subject to the absolute discretion of Congress, with the sole limitation that Congress itself, being created by the Constitution, cannot transgress even on the outside the fundamental principles thereof. These are, for instance, what are ordinarily called the rights of man, and are discussed arguendo by Mr. Justice Brown in Downes v. Bidwell, 182 U. S. 244, 282, 45 L. ed. 1088, 1104, 21 Sup. Ct. Rep. 770. In regard to Porto Rico, Congress has not only constituted a quasi sovereignty as declared in the Rosaly Case, 227 U. S. 584, 57 L. ed 655, 33 Sup. Ct. Rep. 333, but has now, by the Jones Act, expressly declared certain national legislation inapplicable. Whether the 14th Amendment as such applies is not material, because, without being called the 14th Amendment, it is expressly provided in the Bill of Rights in § 2 of the Jones Act that "no law shall be enacted in Porto Rico which shall deprive any person of life, liberty, or property without due process of law, or deny to any person therein the equal protection of the laws." [39 Stat. at L. —, chap. 145, Comp. Stat. — , § 3803 aa.] The effect of this is what must now be determined. Smyth v. Ames, 169 U. S. 466, 42 L. ed. 466, 18 Sup. Ct. Rep. 418.

2. At common law a shipper by a common carrier could sue in the courts for any overcharge, that is to say, any unreasonable charge for transportation of freight. Texas & P. R. Co. v. Abilene Cotton Oil Co. 204 U. S. 426, 436, 51 L. ed. 553, 557, 27 Sup. Ct. Rep. 350, 9 Ann. Cas. 1075. For public reasons connected with general regulation, Congress saw fit, February 4, 1887 (24 Stat. at L. 379, chap. 104), to institute the Interstate Commerce Commission, and this law, with amendments, regulated commerce between the states. It was amended by what is called the Hepburn Act, June 29, 1906, 34 Stat. at L. 584, chap. 3591, Comp. Stat. 1916, § 8569, of which § 2 requires every common carrier to file with the Commission, and print and keep open for public inspection, schedules showing all rates, and "no change shall be made in the rates, fares and charges . . . which have been filed and published by any common carrier in compliance with the requirements of this section except after thirty days' notice to the Commission and to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares or charges will go into effect." This section is an amendment of § 6 of Act of March 2, 1889. The provisions of this act applied "to any common carrier or carriers engaged in the transportation of passengers or property, wholly by railroad . . . from one place in a territory to another place in the same territory. . . ." There would seem to be no doubt that this section applied to Porto Rico. In point of fact, the Interstate Commerce Commission has not assumed active jurisdiction in Porto Rico, except that one of its members has been here, and the Commission has made orders from time to time in regard to safety appliance devices on Porto Rican rail-

roads.   There seems to be no contention that the American
Railroad has in this case filed its schedules with the Interstate
Commerce Commission.   On the contrary, it did file them with
the Executive Council in 1907, and this body approved the rates
heretofore existing.   It is conceded that the proposed 20 per
cent increase of rates has not been filed with the Interstate Com-
merce Commission, but notice has been given, by publication
and otherwise, to shippers and to the Executive Council of
Porto Rico of the proposed increase.   This state of affairs grew
out of the uncertainty whether the Interstate Commerce Act
applied to Porto Rico or not, which was only removed by the de-
cision in the Didricksen and similar cases.   The Jones Act ex-
pressly abolishes the application of the Interstate Commerce Act,
but this does not change the fact that it was applicable in 1907
and thereafter.   The legality of the existing rates, however, is
not in dispute.   Whether notice was given to the Interstate Com-
merce Commission or not, they have been put in force and acted
upon by the railroad and the public, and of them there is no com-
plaint.   As it was not disavowed by the Interstate Commerce
Commission, the act of the Executive Council may possibly be
considered as ratified and to have become the act of the Inter-
state Commerce Commission.

3.   The action of the plaintiff in bringing this suit was at the
instance of the Executive Council, and that body directed this
action upon the bases that the local act of March 12, 1908, is in
effect.   There is no doubt that the Hepburn Act was paramount,
and that so far as the local act conflicts therewith the local act
must give way.   But it is contended by the plaintiff that the lo-
cal act is not inconsistent with the Hepburn Act so far as relates
to rates.   The local act in § 5, being amendment of 1911, says

People v. American Railroad Co.

that public service corporations shall annually submit tariffs of charges, and the Executive Council not only examines these statements, but shall have "full power to amend, alter or add to or eliminate matter from such tariffs . . . and as so amended shall promulgate such tariff of charges . . . and the tariffs . . . so promulgated shall until otherwise provided by the Executive Council constitute the tariffs . . . that shall be enforced by the public service corporations to which they apply, and such public service corporations shall not make any other such charge except as therein provided." [Compilation 1911, § 342.] There may be amendment by the Council upon its own initiative or upon petition, "the intent of this section being to confer upon the Executive Council of Porto Rico, in respect to public service corporations . . . full power equitably and effectively to regulate the charges of said corporations and the conditions of service." A fine is provided for violation of this provision. In § 7 it is declared "unlawful for any public corporation to charge, demand, collect, or receive a greater or less compensation for any service performed by it than is specified in the tariff . . . approved by the Executive Council," under further penalties. Section 9 provides for emergency regulations by the Executive Council, and § 10 for complaints and investigation. Section 15 provides for suits at the instance of the Executive Council, and the case at bar is an instance in point.

Forfeiture of franchises is also provided for in certain cases.

The act is a comprehensive one, and provides for the regulation of all public service corporations, of which railroads are only one kind. It does not seem possible that this system as a whole can be consistent with that of national regulation of rates under the Hepburn Act. Whether there is any room for joint operation of the two laws need not be decided; but an act which

People v. American Railroad Co.

gives the common carriers the right to fix their own rates upon thirty days' notice, subject to regulation afterwards by the Interstate Commerce Commission, and an act which prohibits the enforcement of any rates until they have been approved by the Executive Council of Porto Rico would seem to have, in regard to rates, no room for common operation. If the Executive Council declined to authorize a rate, there would be nothing which the railroad could send up to the Interstate Commerce Commission, and the powers of regulation by the national body would be subordinated to those of the local body. The two acts, therefore, are inconsistent and the Hepburn Act must prevail. Nor can acquiescence by Congress be properly inferred from length of time. This principle applies rather to construction of statutes than, as here, to the power to enact them. Congress does not need to disapprove a void law. Clayton v. Utah, 132 U. S. 632, 642, 33 L. ed. 455, 459, 10 Sup. Ct. Rep. 190.

4. It is contended, however, that, while this may be true, the local act may be regarded as dormant, somewhat as in the case of local state regulations as to insolvency. These are dormant during the pendency of the national Bankruptcy Act. 17 Am. & Eng. Enc. Law, 2d ed. 59; Cyc. Bankruptcy, p. 421; § 5. This is not analogous to state local regulation of matters connected with interstate commerce, such as lighthouses, pilotage, and the like. Mobile v. Kimball, 102 U. S. 697, 26 L. ed. 239; Robbins v. Taxing Dist. 120 U. S. 492, 30 L. ed. 695, 1 Inters. Com. Rep. 45, 7 Sup. Ct. Rep. 592. It is based upon the principle that the state is a sovereign, and that its legislation survives a temporary regulation by Congress of the same subject. It has been applied in Porto Rico in this court to certain commercial matters, on the ground that the Foraker Act expressly

continued in force the existing laws, except so far as affected by the national laws, such as bankruptcy. And the Jones Act in § 57 provides "that all laws and ordinances of Porto Rico now in force shall continue in force and effect." Even upon the theory of suspension, it could not be said that the Porto Rican act was in force on March 2, 1917. A law that is suspended cannot be said to be in force. The act of the Porto Rican legislature is not that of an independent body, like a state legislature, but is subordinate to legislation by Congress itself, that is to say, Congress confers the power of partial legislation on the local legislature. In no sense, when Congress itself acts upon the subject, can it be said that local legislation is suspended. It would amount to saying that a law which is repealed by a new act of Congress shall revive when the new law itself is repealed. This cannot be contended. The case is even stronger, for the Porto Rican Act of 1908 was subsequent to the Act of Congress of 1906, and it must be held that, so far as they covered the same ground, such as railroad rates, the Porto Rican act never went into effect at all.

5. The Local Law of 1908 applied to many other things than railroad rates, and to the extent of these other subjects it was a valid exercise of power granted by the Foraker Act. Under the Foraker Act, quite apart from the question of the Hepburn Act, Porto Rico could not legislate to the extent of fixing railroad rates. The specific powers granted in the Foraker Act do not embrace this subject, and it is doubtful whether Congress could give the power under the 14th Amendment. All Congress had undertaken to do by the Hepburn Act was to allow the public authorities to declare void and unreasonable rates which had been fixed by the carrier. It is not to be supposed

that Congress meant in any event to authorize Porto Rico to do more than Congress had done. It is the right of a carrier to fix its own rates subject to suit by an individual if a rate is unjust, and subject to general regulation by the public authorities. The Local Act of 1908 was valid as to all other subjects, and even as to railroads in certain respects. For instance, there is nothing inconsistent with the act of Congress in the local requirement compelling railroads to file their rates with the Executive Council and otherwise make them public locally. This is merely following out the policy of the Hepburn Act. Nor is there anything improper in the provision in § 9 of the Act of 1908 that "the Executive Council shall have power in emergent cases to prevent injury to the business or interests of the people . . . temporarily to alter or amend any existing rate." [Compilation 1911, § 346.] This would apply to any public service corporation other than railroads, and, if it affected an emergency not contemplated by the Hepburn Act, there is no reason why it would not apply even to railroads. A fortiori, if Congress repealed the Interstate Commerce Act, this discretionary power would still exist (Act March 2, 1917, § 57), not on the ground of any dormancy of the act, but on account of the coming about of the emergency which Congress had not provided for, nor had even inferentially declared should not be provided for. The fixing of rates is a legislative function. Reagan v. Farmers Loan & T. Co. 154 U. S. 397, 38 L. ed. 1023, 4 Inters. Com. Rep. 560, 14 Sup. Ct. Rep. 1047. It cannot be provided for by the courts or by the executive authority. It must be provided for by direct legislation or by fixing a commission to which shall be delegated such powers. In the case at bar this power would seem to rest at present with what is called the "legisla-

tive assembly" under § 38: "The legislative assembly of Porto Rico is hereby authorized to enact laws relating to the regulation of the rates, tariffs, and service of public carriers by rail in Porto Rico." [39 Stat. at L. —, chap. 145, Comp. Stat. —, § 3803p.] The legislative body in Porto Rico is elsewhere always called the "legislature," consisting of a senate and lower house. Whether reference is made in this section to the existing legislative assembly so as to limit this power to this expiring body, or whether the reference is to the legislature under another name, is not now material. There is a legislative assembly at present from either point of view, but it is not necessary for either body to give the Executive Council power to provide for emergencies to prevent injury to the business or interests of the people. That has already been done by § 9 of the Act of 1908. Suppose, for instance, that an earthquake or cyclone destroyed a large part of the defendant railroad, the Executive Council would have the right under this section to provide for the emergency in favor of the railroad. Suppose, on the other hand, the railroad should wrongly think circumstances justified its increasing its rates 100 per cent, with the result of destroying the business and interests of the people. The Interstate Commerce Commission could not act, because its power has ceased. The legislature could not act, because the injury might be done before the legislative assembly could be reconvened. Section 9 is to be deemed as never dormant, but remaining in existence to meet any emergency, whether that is due to a change of legislative policy, natural events, or otherwise. The same result would follow if it was supposed that the repeal of the Interstate Commerce Act was intended by the Jones Act to occur only when the new local system has been thoroughly organ-

IX. Porto Rico.—38.

ized after the elections in July next. In such event the Interstate Commerce Commission would still have the potential power it has always had, but an emergency might occur which the Interstate Commerce Commission, from its absence, could not rectify. The local law, in other words, is not to be considered as dormant, but as applying to anything or to any emergency which comes within its scope, and does not come within the scope of the Interstate Commerce Commission. In view of the breadth and scope of the legislation of Congress as to Porto Rico it will not be presumed no power is granted to meet emergencies.*

6. It seems that the defendant has submitted to the jurisdiction of the Executive Council in the past, but considers that it has no jurisdiction in the present. Jurisdiction cannot be conferred by consent, and whatever the acts of the parties in the past the question is only as to power in the present. The defendant in this connection raises the point that the people of Porto Rico have no interest, and therefore cannot sue, courts being organized only to decide controversies between parties in interest. Section 15 of the local act declares that "whenever the Executive Council shall be of the opinion that a public service corporation, subject to its supervision, is failing or omitting . . . to do anything required of it by law . . . or is doing anything or about to do anything . . . contrary to, or in violation of law . . . it shall direct the attorney General of Porto Rico to commence an action or proceeding in the court having competent jurisdiction in the name of The People of Porto Rico for the purpose of having said violation

---

* To use the thought of Chief Justice Marshall, we must remember it is a government we are expounding. M'Culloch v. Maryland, 4 Wheat. 407, 4 L. ed. 601.

or threatened violation stopped or prevented, either by mandamus or injunction." The attorney general shall thereupon take the proper steps. . . . "Such other persons and corporations as the court may deem necessary or proper to join as parties in order to make its order, judgment or writs effective, may be joined as parties upon application of the attorney general." [Compilation 1911, § 352.] If the Executive Council has jurisdiction over emergencies, as above held, it has power to direct a suit to be filed to cover the emergencies, and in that view of the case this suit is properly brought. Whether there shall be shown to exist such an emergency is a question of fact upon which the court does not pass. And whether there should not be joined as parties plaintiff or defendant, persons or corporations largely interested in the subject-matter, to wit, the tariff on sugar cane products, is a question which has not been presented. Under the new equity rules it would seem that persons interested may be joined pro inter se suo, so as to have the whole matter determined in one action. On the other hand, persons having such interest in the subject-matter of the action may not care to intervene under equity rule 37, and may prefer to proceed in their own individual actions. While the point is suggested, it is not necessary to discuss it further.

While, therefore, the present suit cannot, in the view of the court, be maintained under the power of the Executive Council to fix rates as declared by § 7 of the Local Act of 1908, it may be that the 20 per cent raise in rates proposed to be made by the railroad presents an emergency which will affect the business of the Island, according to § 15 of that act. It is agreed that a preliminary injunction, if issued, shall be without bond, and so the proper course would seem to be to retain the bill for

five days so as to enable the plaintiff, if so disposed, to amend it so as to come under the emergency section of the Act of 1908, and make other parties if so disposed, and so justify a preliminary injunction.

It is accordingly ordered that the restraining order is continued in force for five days so as to permit proper amendment of the bill.

It is so ordered.