SOUTHERN PAC. CO. v. CORBETT et al.
No. 4055—S.

District Court, N. D. California, S. D.
Sept. 10, 1937.

those engaged in commerce among the states.

By the logically immediate process of federal law, the tax on these materials stored for current repairs, operation, etc., of the interstate railway is translated into the passenger fares and merchandise carriage rates of all the passengers and shippers of the thirty or forty states shipping into and out of California.[1] The persons interested in and affected by our decision, though not appearing here, are those upon whom the tax will certainly fall. Though not litigants, their interest transcends that of the corporation and its stockholders.

The Constitution gives to Congress the regulation of the management of interstate railways. If the court decides that this storage of materials is not a use in interstate commerce, then the Congress may not declare it to be or regulate it as such a use. If Congress desires to require the railways to keep in storage for current use such necessary materials, it can do so only by invading intrastate activities under an extension of the principles laid down in National Labor Rel. Board v. Jones & Laughlin Steel Co., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and Edwards v. U. S. (C.C.A.9) 91 F.(2d) 767, decided July 22, 1937. The delicate question of the boundary between state and federal power would seem to make proper the presence of the Attorney General of the United States, although the recent legislation requires the opportunity for his presence only where there is presented the constitutionality of a federal statute.[2]

This is a suit in equity brought before a court of three judges pursuant to section 266 of the Judicial Code[3] seeking to have enjoined pendente lite and permanently the enforcement of a statute of the State of California, namely, the Use Tax Act of 1935.[4] The defendants are the California State Board of Equalization, the individual members of the board, and the Attorney General of the state. The injunctions are sought on the grounds that the enforcement of the tax in this case will unduly burden the plaintiff's interstate com-

Harry H. McElroy and Guy V. Shoup, both of San Francisco, Cal., for plaintiff.

U. S. Webb, Atty. Gen., for defendants.

Before DENMAN, Circuit Judge, and ST. SURE and ROCHE, District Judges.

DENMAN, Circuit Judge.

This case involves the question whether the necessary incidental storage of materials bought by an interstate railway company for installation in the service of repair and replacement, under a predetermined plan for the maintenance and improvement of the service, is a use in interstate commerce. The State of California, under a general tax law applying to all persons storing within the state goods purchased without the state, upon which goods no state sales tax has been paid, seeks to have included in the large number of persons subject to the statute

---

[1] Taxes are, of course, taken into account in determining a carrier's operating expenses or property valuation for rate fixing purposes. See N. Y., Philadelphia & Norfolk Ry., 97 I.C.C. 273; Great North. R. Co., 133 I.C.C. 1.

[2] H.R. 2260, Pub.Act No. 352. § 1,

approved August 24, 1937, 28 U.S.C.A. § 401.

[3] Act of June 18, 1910, 36 Stat. 557, amended (now Jud.Code § 266) 28 U.S.C. A. § 380.

[4] St.Cal.1935, c. 361, p. 1297.

merce business contrary to the provisions of article 1, § 8, of the Federal Constitution, and that there exists for the plaintiff no adequate remedy at law.

A temporary restraining order against the enforcement of the tax has been issued. The matter is now before this court on the plaintiff's prayer for interlocutory injunction and the defendants' motion to dismiss the bill. In support of their motion to dismiss the defendants contend that the plaintiff has an adequate remedy at law and that the bill states no ground of relief whatsoever.

Under the assailed tax measure, later considered in detail, the defendants seek to impose against the Southern Pacific Company an excise tax upon the "storage" or "use" of personal property purchased by the company without the State of California, shipped to points within the state and there held, in accordance with predetermined plans, to be installed and made an active part of the company's tangible equipment used within the state for purposes of its inextricably interwoven interstate and intrastate commerce.

The Southern Pacific Company is a corporation of Kentucky engaged as a common carrier by railroad in seven states, including California. Half of its more than 8,000 total mileage is in California. Its gross operating revenue for the calendar year 1935 was more than $124,000,000, of which $63,000,000 was earned on California business. Of this latter figure over $34,000,000 was attributable to interstate commerce.

The specific personal property against the use of which the excise is sought to be enforced consists of a great variety of material necessary for the conduct of plaintiff's intermingled interstate and intrastate business. A portion of it was purchased for integration in plaintiff's railroad system pursuant to an existing maintenance program for the year 1936. The remainder was acquired to have on hand for the recurring demands of maintenance and emergency requirements. Among other articles, the property purchased included rails, frogs, switches, valve oil, lumber, stationery, and tools. The complaint alleges that the greater portion was specifically designed for use in the operation, maintenance, and repair of the road, or "peculiarly adapted to railroad uses * * * and * * * not suitable for any other use." The articles were all required for the efficient and economical conduct of the road.

Concerning the interstate commerce purposes of these purchases, the complaint alleges: "Said purchases were made by the plaintiff through the use of its operating capital consisting of money or current assets definitely devoted to the service of transportation, or through the credit of said plaintiff as a railroad engaged in the service of transportation and upon the purchase of said materials and the payment therefor, the expenses therefor are in due course charged into the operating expenses of said carrier to the appropriate accounts for operation, maintenance or repairs, according to the accounting rules and regulations prescribed for railroads engaged in interstate commerce under the provisions and requirements of the Interstate Commerce Act, and that all of said items of tangible personal property so purchased by the plaintiff were devoted to the service of transportation immediately upon their purchase and that upon the purchase of said articles they immediately became a necessary and indispensable part of working capital, material, supplies, equipment and instrumentalities for the operation of said railroad and the said articles and each and all of them became, were and are instrumentalities used indiscriminately and inseparably in the operation, maintenance and repair of plaintiff's railroad for conducting interstate transportation and intrastate transportation from the time the same were purchased therefor, and any storage, use or consumption thereof, which occurred within the State of California cannot be separated or segregated as between intrastate and interstate transportation, the said railroad contemporaneously carrying by means of the same organization and facilities, both intrastate and interstate commerce and said items and materials being from the time of purchase outside the State of California inextricably devoted to and used in service of both classes of commerce."

And further: "* * * that prior to any keeping or retention of said materials within the State of California, said materials were allocated and dedicated to sole and exclusive use in interstate commerce and any keeping or retention thereof within the State of California was and is an inseparable part of the use of said materials and each item thereof in interstate commerce."

The gravamen of these allegations is thus perceived to be that any "keeping" or "storage" of the property within the state is a *use* of the property in interstate commerce preparatory to a *subsequent use* by way of actual physical consumption.

During the three months ending June 30, 1936, the property described in the complaint, purchased outside of and shipped into California, amounted to $1,590,190.62. The use tax assessed on this material totals $47,705.72.

The act in question imposes an excise tax of 3 per cent. of the sale price upon the storage, use, or other consumption of tangible personal property within the state.[5] Leaving out of account the alleged character of the properties as instrumentalities of interstate commerce, the plaintiff's exercise of uses incidental to ownership over them within the state comes within the broad definitions of the statute.[6]

Exempt from the operation of the tax are materials protected from excise by the Federal or State Constitution, and material upon which the California 3 per cent. sales tax has been paid.[7] Thus it is observed that the use tax is complementary to the sales tax, being designed to reach purchasers who acquire personal property in other states.

If the property taxed is purchased from a retailer maintaining a place of business within the State of California, the purchaser pays the tax to the retailer and the latter pays it to the State Board of Equalization. If the retailer maintains no place of business within the state, the purchaser pays the board directly. In either case returns and payments are due quarterly (sections 6, 7).

In the event of nonpayment, the board may file with any county clerk a certificate showing due determination of the tax and the failure to pay. Upon such filing the county clerk is required to enter a judgment for the state against the delinquent. The judgment is subject to execution in the usual manner, and in addition it becomes a lien upon any real property owned by the delinquent within the county (section 20, St.1935, p. 1305). In addition to this procedure, the board is empowered to bring an action in any court of competent jurisdiction to recover the tax at any time within three years after it becomes due (section 28).

The taxpayer is afforded but one remedy to recover taxes illegally exacted. He may pay under protest and bring an action in the state court.[8]

The bill alleges that the defendants will, unless restrained, take summary action to

[5] Cal.St.1935, c. 361, p. 1298.
"Sec. 3. An excise tax is hereby imposed on the storage, use or other consumption in this State of tangible personal property purchased from a retailer on or after July 1, 1935, for storage, use or other consumption in this State at the rate of three per cent. of the sales price of such property.

"Every person storing, using or otherwise consuming in this State tangible personal property purchased from a retailer shall be liable for the tax imposed by this act."

[6] Sec. 2 * * *
"(a) 'Storage' means and includes any keeping or retention in this State for any purpose except sale in the regular course of business of tangible personal property purchased from a retailer.

"(b) 'Use' means and includes the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it shall not include the sale of that property in the regular course of business."

[7] "Sec. 4. The storage, use or other consumption in this State of the following tangible personal property is hereby

specifically exempted from the tax imposed by this act:

"(a) Property, the gross receipts from the sale of which are required to be included in the measure of the tax imposed by Chapter 1020, Statutes of 1933 and any amendments made or which may be made thereto.

"(b) Property, the storage, use or other consumption of which this State is prohibited from taxing under the Constitution or laws of the United States of America or under the Constitution of this State."

[8] "Sec. 29. No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action or proceeding in any court against this State or against any officer thereof to prevent or enjoin under this act the collection of any tax or any amount of tax herein required to be collected; but after payment of any such tax or any such amount of tax herein required to be collected under protest, duly verified and setting forth the grounds of objection to the legality thereof, the retailer or person making the payment may bring an action against the State Treasurer in a court

collect the more than $40,000 alleged to be due upon the property purchased during the quarter ending June 30, 1936. It further states that like or greater amounts of property will be purchased during quarter years to come. Temporary and permanent injunctions are asked against future exactions as well as the claim for the second quarter of 1936.

The defendants' motion to dismiss raises questions which have narrowed to two: (A) Does there exist for the plaintiff an adequate remedy at law? (B) Is the threatened exaction void for repugnance to the Federal Constitution?

(A) We hold that the plaintiff has no adequate remedy at law.

Plaintiff presents several reasons to support its contention that, if the tax is unconstitutional, it has no adequate legal remedy. It will be necessary to consider only one of the grounds urged, which ground, in our opinion, is controlling.

The use tax provides but one forum for the recovery by suit at law of taxes paid under protest. Section 29, note 8, supra. This forum is "a court of competent jurisdiction in the county of Sacramento." Obviously this provision contemplates a suit only in the state court.

When a bill in equity is brought in a federal court, the test of the adequacy or lack of adequacy of the remedy at law is the legal remedy afforded in the federal court. Where no legal remedy exists in that forum, the remedy at law is inadequate. This conclusion is impelled by a consideration of the nature of the right to sue in the federal courts. It is a substantial constitutional right. Arrowsmith v. Gleason, 129 U.S. 86, 9 S.Ct. 237, 32 L.Ed. 630. When one has a cause of action at law, and there exist requisites of federal jurisdiction, his remedy at law is the right to sue in the state or federal tribunal at his election. To deprive him of this choice materially impairs the completeness and adequacy of his remedy.

In Smyth v. Ames, 169 U.S. 466, 515, 516, 517, 18 S.Ct. 418, 422, 42 L.Ed. 819, a statute of Nebraska set up a board to prescribe maximum railroad rates. Any railroad deeming itself aggrieved was permitted to bring an action in the Supreme Court of the state to show that the rates fixed were unjust. If the state court sustained the contention of the railroad, it was authorized to issue an appropriate order to the board requiring a correction of the inequity.

Suit was brought by a railroad company in the United States District Court to enjoin the enforcement of the statute. The Supreme Court of the United States held that a case of equity jurisdiction was made out, saying: "The adequacy or inadequacy of a remedy at law for the protection of the rights of one entitled upon any ground to invoke the powers of a federal court, is not to be conclusively determined by the statutes of the particular state in which suit may be brought. One who is entitled to sue in the federal circuit court may invoke its jurisdiction in equity whenever the established principles and rules of equity permit such a suit in that court; and he cannot be deprived of that right by reason of his being allowed to sue at law in a state court on the same cause of action.

---

of competent jurisdiction in the county of Sacramento for the recovery of the amount paid under protest. No such action may be instituted more than sixty days after the tax or the amount herein required to be collected and paid to the State becomes due and payable, and failure to bring suit within said sixty days shall constitute waiver of any and all demands against the State on account of alleged overpayments hereunder. No grounds of illegality shall be considered by the court other than those set forth in the protest filed at the time of payment of the tax or the amount herein required to be collected and paid to the State.

"If in any such action judgment is rendered for the plaintiff, the amount of the judgment shall first be credited on any taxes or amounts due from the plaintiff under this act, and the balance of the judgment shall be refunded to the plaintiff. In any such judgment, interest shall be allowed at the rate of six per cent. per annum upon the amount found to have been illegally collected from the date of payment of such amount to the date of allowance of credit on account of such judgment or to a date preceding the date of the refund warrant by not more than thirty days, such date to be determined by the Controller.

"In no case shall any judgment be rendered in favor of the plaintiff in any action brought against the State Treasurer to recover any amount paid hereunder, when such action is brought by or in the name of an assignee of the retailer or other person paying said amount, or by any person other than the person who has paid such amount."

\* \* \* 'A state cannot tie up a citizen of another state, having property rights within its territory, invaded by unauthorized acts of its own officers, to suits for redress in its own courts.' "

In Chicago, B. & Q. Ry. v. Osborne, 265 U.S. 14, 16, 44 S.Ct. 431, 68 L.Ed. 878; a railroad company brought suit in the federal court to restrain the collection of taxes levied by the State of Nebraska, which taxes were alleged to be unjustly discriminatory. The state law provided a remedy by writ of error to the Board of Equalization from the Supreme Court of the state. In holding that the taxpayer was authorized to seek federal equity relief, the United States Supreme Court said: "If an action to recover the payment were allowed, the suit might be brought in the Courts of the United States, under the usual conditions, as well as in those of the State. \* \* \* But the writ of error of course can be sued out only in the State, and a remedy in the State Courts only has been held not to be enough. Smyth v. Ames, 169 U.S. 466, 516, 18 S.Ct. 418, 42 L.Ed. 819; St. Louis-San Francisco Ry. Co. v. McElvain (D.C.) 253 F. 123, 136; Franklin v. Nevada-California Power Co. (C.C.A.) 264 F. 643, 645."

The principle was reaffirmed in Risty v. Chicago, etc., Ry. Co., 270 U.S. 378, 388, 46 S.Ct. 236, 240, 70 L.Ed. 641: "The test of equity jurisdiction in a federal court is the inadequacy of the remedy on the law side of that court and not the inadequacy of the remedies afforded by the state courts. Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819; Chicago, B. & Q. R. Co. v. Osborne, supra."

(B) We hold that the tax sought to be levied upon the plaintiff is an unconstitutional burden on interstate commerce.

The tax in question is laid upon the exercise of certain rights of ownership over personal property; these rights being enumerated in the broad statutory definitions of "use" and "storage" (footnote 6, supra). It is not an ad valorem property tax, admittedly valid although the property consist of instrumentalities of interstate commerce, nor is it a tax on the privilege of doing an intrastate business, upheld in Pacific Telephone & Telegraph Co. v. Tax Commission, 297 U.S. 403, 56 S.Ct. 522, 80 L.Ed. 760, 105 A.L.R. 1.

The plaintiff does not urge constitutional objections other than the contention that the enforcement here will unduly burden interstate commerce. And even under this heading there can be no objection to the excise on the ground that the materials were imported into the state before the incidence of the tax. Henneford v. Silas Mason Co., 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814.

The question narrows, then, to the issue whether at any time after their importation into the State of California the materials purchased by the plaintiff were not in use in interstate commerce. If they at all times were in actual interstate commerce use or intermixed interstate-intrastate commerce use, that use cannot be subjected to a state tax. It is well settled that such a tax constitutes a forbidden burden on interstate commerce. Helson and Randolph v. Kentucky, 279 U.S. 245, 249, 252, 49 S.Ct. 279, 280, 281, 73 L.Ed. 683; Bingaman v. Golden Eagle Western Lines, 297 U.S. 626, 628, 56 S.Ct. 624, 80 L.Ed. 928; Cooney v. Mountain States Tel. Co., 294 U.S. 384, 393, 55 S.Ct. 477, 482, 79 L.Ed. 934.

By their motion to dismiss the defendants admit the facts pleaded in the complaint. That is, they admit that the items of property they seek to tax "were devoted to the service of transportation immediately upon their purchase," that their financing and accounting was carried on "according to the accounting rules and regulations prescribed for railroads engaged in interstate commerce under the provisions and requirements of the Interstate Commerce Act [49 U.S.C.A. § 1 et seq.]," that each item was an essential and vital factor in the maintenance and repair of plaintiff's interstate commerce plant, that at all times since their purchase "said materials were allocated and dedicated to sole and exclusive use in interstate commerce and any keeping or retention thereof within the State of California was and is an inseparable part of the use of said materials and each item thereof in interstate commerce."

Thus defendants admit the factual contention that plaintiff's use of the purchased materials at all times since their purchase was a vital use in interstate commerce. Nevertheless they urge that as a matter of law the only interstate commerce use which is free from state taxation is use by way of actual physical consumption or use occurring after the materials have been installed in the operating plant, such

as the gasoline being consumed in the Helson and Bingaman Cases, or the telephone instruments actually installed in the Cooney Case.

The statute specifically exempts property protected from taxation by the Constitution. While this does no more than declare what already is the law, it demonstrates the solicitude of the Legislature toward the recognition of constitutional limitations. It indicates that, when the Legislature defined taxable storage and use it was anxious to insure that interstate commerce use would be protected. Yet defendants would have the statute read:

"(a) 'Storage' means and includes any keeping or retention in the State * * * of tangible personal property (when such keeping or retention is an inseparable part of the use of such property in interstate commerce, when such property is allocated and dedicated to interstate commerce from the moment of its purchase and is recognized by the Federal Government through the Interstate Commerce Commission as a portion of the capital of the taxpayer used in interstate commerce). * * *"

"(b) 'Use' means and includes the exercise of any right or power over tangible personal property incident to the ownership of that property (which exercise of right or power is a part of the use of such property in interstate commerce prior to a subsequent use by way of consumption). * * *"

We do not believe the statute is thus to be construed. However, if this is the meaning of the act, then we are forced to conclude that it is an unconstitutional exertion of power by the state Legislature.

This conclusion is impelled by a realistic approach to the facts presented by the bill. In Pacific Telephone & Telegraph Co. v. Tax Commission, 297 U.S. 403, 413, 56 S.Ct. 522, 524, 80 L.Ed. 760, 105 A.L.R. 1, the Supreme Court, dealing with the validity of a state tax, repeated its earlier admonition in Gregg Dyeing Co. v. Query, 286 U.S. 472, 480, 52 S.Ct. 631, 634, 76 L. Ed. 1232, 84 A.L.R. 831: "The question of constitutional validity is not to be determined by artificial standards."

■ Whether a use in storage for current consumption is a use in interstate commerce is a question of ultimate fact. Here the court must find, or refuse to find, this ultimate fact upon the admitted facts and upon those of which it takes judicial notice. It cannot use "artificial standards." It must consider usual business and industrial concepts.

The question is analogous to that presented by a merchandising company's stock for sales in the current season, stored for daily supply of its counters. If such storage is a use other than a merchandising use, what use is it? Or take the case of a canner's stock of cans stored in his plant at the beginning of a fruit season, from which stock there is daily withdrawn those required for the arriving fruit. What sort of use is the storage of these cans, if not a canning use?

Certainly any merchandiser or canner or other industrialist or businessman would consider it a glaring example of the application of an "artificial standard" to say that such a storage for current consumption was not a use in the business or industry in question. He might well answer: What other business have I in which that storage has any use?

When we view realistically the facts set out in the bill, supplemented with our judicial notice of the practical necessities of a large transportation enterprise, we clearly perceive that this property is used in interstate commerce from the time of its purchase.

Consider first the property purchased for and devoted to a sole, fixed, and predetermined use in an existing interstate commerce maintenance program. The storage of such property is a use which is as integral a part of the interstate commerce project as are the rails over which interstate trains are actually running. It is the definite predetermined character of its purpose that makes the storage of these purchased articles of equipment as vital to the entire plant before installation as well as afterwards. The situation differs materially from that of the purchase of a body of goods a part or all of which will, in the ordinary turn of events, be used in the future in interstate commerce operations.[9]

■ It is no answer to say that the plaintiff might change its intention after purchasing and use the property for some purely intrastate purpose not intended at the time of purchase. Granting that such legal right exists, it would be as persuasive to argue that the state might tax the use

[9] See Nashville, Chattanooga & St. Louis Ry. v. Wallace, 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191.

of an interstate locomotive in operation on the theory that its owner is privileged to use it at any time for a purely local purpose. The question concerns not what the plaintiff might do; it concerns, rather, what the plaintiff is actually doing.

■ Likewise, property purchased for the sole, fixed, and predetermined purpose of serving as "standby" or reserve equipment in an interstate commerce plant is employed in interstate commerce from the time of its purchase. It is almost axiomatic that the far-flung system of an interstate railroad cannot be conducted without the presence of reserve supplies. Unpredictable events requiring replacement and repair are of daily occurrence. A flood washes out a section of track. Can it rationally be argued that the rails and ties held in readiness against this emergency are not an integral portion of the company's interstate commerce equipment? One might as well contend that a derail switch is not in use in interstate commerce until an emergency requires it to function.

■ The distinction which the defendants would have us make between property before and property after installation, whether purchased for an existing necessity or as reserve, strikes us as no more cogent than the argument that the use of a railway station could be taxed because for long periods no interstate trains stop in front of it and no interstate passengers or freight make use of it; or the argument that the use of a locomotive is taxable by the state during the period in which it is standing idle between interstate trips; or that the telephones held nontaxable in the Cooney Case, supra, should be subject to excise because there were long periods when no interstate calls were being made on any one of them.

In short, a use by way of storage or retention of materials can be fully as vital to interstate commerce as a subsequent use by way of consumption or after installation. A somewhat similar situation is presented by a requirement of pilotage fees which a vessel leaving or entering a harbor must render to a pilot whether or not it avails itself of his services. Pacific Mail S. S. Co. v. Joliffe, 2 Wall. 450, 17 L.Ed. 805.

The federal government has recognized the interstate character of the use of materials like those described in the complaint through regulations (having the force of law) issued by an administrative agency, the Interstate Commerce Commission.[10]

We do not believe that the California Legislature, specifically declaring in section 4 of the act (note 7, supra) its intention to recognize the constitutional prohibition against the taxation of the use of materials in interstate commerce, intended nevertheless to subject to taxation the use of materials not only set apart by the carrier for interstate commerce uses, but recognized as so devoted by the federal government.

In a case calling for the determination of whether a particular use of materials is an intrastate or an interstate use, we touch upon the boundary between state and federal power. The requirement of materials for current repairs and replacement is so obviously a necessity for interstate commerce that no legislation has been needed to compel it. However, the Congress could well pass a statute requiring that: "Interstate carriers shall purchase and store for current repairs necessary materials for the efficient conduct of their railways, said usage by said carriers of said materials awaiting current installation to be maintained in places convenient to the places of their installation."

To illustrate how our decision in this case may affect the scope of federal power, we assume that the above statute has been passed. In opposition to it we have the instant State Use Tax Act which the defendants would have read: "(a) 'Storage' means and includes any keeping or retention in this State for any purpose * * * of tangible personal property (in-

---

[10] I. C. C. classification of accounts for steam railroads:

"716. Material and Supplies.

"This account shall include the balances representing the cost, less depreciation, if any, of all unapplied material such as road and shop materials, articles in process of manufacture by the accounting company, fuel, stationery, and dining car and other supplies. In determining the cost of material and supplies suitable al-

lowances shall be made for any discounts allowed in the purchase thereof.

"Note—Balances representing the cost of unapplied construction material and supplies located at the point of use, which have been purchased for projected new roads and extensions, are provided for in road and equipment account No. 47, 'Unapplied construction material and supplies'."

948

cluding materials purchased and stored by interstate carriers for current repairs and maintenance necessary for the efficient conduct of their railways). * * *"

The power delegated to Congress under the commerce clause is paramount to the reserved power of the state, when the two come in conflict. Minnesota Rate Cases (Simpson v. Shepard) 230 U.S. 352, 399, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann.Cas.1916A, 18; National Labor Relations Board v. Santa Cruz Fruit Packing Co. (C.C.A.9) 91 F. (2d) 790, decided July 31, 1937. Hence in such a conflict of opposing authority presented by the statutes pictured above, this court would be required to indulge every presumption in favor of the congressional determination that the usage of materials described in both statutes was a use in interstate commerce. Ogden v. Saunders, 12 Wheat. 213, 269, 6 L.Ed. 606. Such determination being a reasonable hypothesis, we would be required to accept it as true. Against it the state statute would necessarily fall as invalid. It is because of this possible conflict that we cannot apply the Bushrod Washington doctrine of Ogden v. Saunders to the state tax legislation challenged in this case.

Conversely when the state acts within the scope of its reserved powers, every presumption is indulged in favor of the validity of its legislation. Such was the case in Pacific Gas & Electric Co. v. Sacramento Municipal Utility District, 92 F.(2d) 365, recently decided by the Circuit Court of Appeals for the Ninth Circuit.

In support of their contention that the materials in question here are subject to the use tax, the defendants rely strongly on the case of Nashville Ry. Co. v. Wallace, 288 U.S. 249, 261, 266, 53 S.Ct. 345, 347, 77 L.Ed. 730, 87 A.L.R. 1191. In that case the railroad brought suit in a Tennessee court for a declaratory judgment holding unlawful an excise tax of that state levied upon the storage and withdrawal from storage of gasoline.

The railway purchased the gasoline from points outside the state, brought it into Tennessee, and stored it in private tanks. Subsequently all of it was withdrawn from storage to be used as a source of motive power in interstate railway operations. The company assailed the tax both on the ground that the gasoline while stored was still a subject of interstate commerce and on the ground that, because of its subsequent use as fuel, the tax was in effect a tax upon the use of the fuel in interstate commerce. The Supreme Court affirmed the highest court of Tennessee in decreeing that the tax was valid. In answer to the railway's first contention, it said (at page 266 of 288 U.S., 53 S.Ct. 345, 349, 77 L.Ed. 730, 87 A.L.R. 1191): "The gasoline, upon being unloaded and stored, ceased to be a subject of transportation in interstate commerce, and lost its immunity as such from state taxation. * * * The fact that the oil was, in the ordinary course of appellant's business, later withdrawn from storage for use, some within and some without the state, part of it thus becoming again the subject of interstate transportation, did not affect the power of the state to tax it all before that transportation commenced."

In answer to the argument that the tax was one in effect upon the use of gasoline in interstate transportation, it was held (at page 267 of 288 U.S., 53 S.Ct. 345, 349, 77 L.Ed. 730, 87 A.L.R. 1191):

"We cannot say that the tax is a forbidden burden on interstate commerce because appellant uses the gasoline, *subsequent* to the incidence of the tax, as an instrument of interstate commerce. Taxes said to burden interstate commerce directly when levied upon or measured by the operation of interstate commerce or gross receipts derived from it, are beyond the state taxing power. * * *

"But interstate rail carriers are not wholly immune from other forms of non discriminatory state taxation, even though the burden of the tax is thus indirectly or incidentally imposed upon the interstate commerce in which they are engaged. It cannot be doubted that, when the gasoline came to rest in storage, the state was as free to tax it, notwithstanding its *prospective* use as an instrument of interstate commerce, as it was to tax appellant's right of way, rolling stock, or other instruments of interstate commerce, which are subject to local property taxes." (Italics supplied.)

Here the Supreme Court makes a finding of ultimate fact that the storage was not a use in interstate commerce. The admitted probative facts in that case upon which the finding of ultimate fact was made are not the same as in the instant case. In the case at bar the admitted

fact is that the storage is an *immediate* and not a "prospective use" in interstate commerce.

It is plain from the above quotation that the Supreme Court did not have before it for decision in the Nashville Case the question whether or not the gasoline stored was already set apart, devoted, and predetermined for use in interstate commerce before it entered the state. We have studied exhaustively not only the opinion of the Supreme Court but also the record and briefs in that case. Nowhere do we find that the gasoline upon entering the State of Tennessee or upon its deposit in the storage tanks was allocated, set apart, and dedicated to interstate commerce uses. Nowhere do we find contention or proof that the stored gasoline was a part of the railroad's current operating inventory, recognized as such by the federal government. It was nowhere argued that the gasoline while in the tanks was being used in interstate commerce. As we have already indicated, property is not exempt from state use taxation merely by virtue of the fact that in the ordinary turn of events it will be used in interstate commerce, or the fact that subsequently all of it has been so used. In each case there must be facts, admitted or proved, which show that the keeping or retention is in itself a use in interstate commerce.

What we have said of the Nashville Case is equally true of Edelman v. Boeing Air Transport, 289 U.S. 249, 251, 253, 53 S.Ct. 591, 592, 77 L.Ed. 1155. In that case the taxpayer purchased gasoline within and without Wyoming and stored the same in tanks at its Wyoming airports. It was subsequently withdrawn, some for local sale, some for local use, and some for fueling the taxpayer's interstate airplanes. Wyoming levied an excise tax on the use of gasoline, the incidence of the tax falling on the withdrawal from storage. The taxpayer objected to paying the excise on the fuel withdrawn for interstate planes. The Supreme Court held against the taxpayer, saying that the ruling facts of the case were identical with those in the Nashville decision.

Our examination of the Edelman decision reveals that, as in the Nashville Case, there was neither contention nor proof made that the gasoline taxed was set apart or allocated by the taxpayer to an interstate use before it was actually being consumed in the planes; nor any evidence that it was in any way brought under the jurisdiction of the Interstate Commerce Commission. The case is even weaker than the Nashville decision, in view of the fact that when the gasoline was put in storage only an indefinable part of it was subsequently to be used in interstate commerce.

We hold, therefore, that the Nashville and Edelman Cases are not controlling on the facts alleged in this complaint. The facts alleged and admitted here bring this case within the principle of the Helson, Bingaman, and Cooney Cases. In this view it is unnecessary to consider whether the authority of the Nashville and Edelman Cases is weakened by Graves v. Texas Co., 298 U.S. 393, 401, 56 S.Ct. 818, 822, 80 L.Ed. 1236, wherein it was held, without mentioning the Nashville and Edelman decisions, that a state tax levied on the withdrawal of gasoline from storage for delivery to the United States was void as being an exaction against the activities of the federal government.

Reaching a conclusion similar to that of the District Court for Washington, in construing like provisions of a use tax of that state,[11] we hold that the defendants may not constitutionally enforce the provisions of the California Use Tax Act against the plaintiff upon the property set out in the complaint.

The defendants are at liberty, of course, to put the plaintiff to proof of its allegations of present use of the materials as alleged in the bill. And nothing in this opinion bears upon the right of a state to levy a tax upon the intrastate use of property such as that in issue here, under any formula calculated reasonably to apportion the interstate and intrastate commerce uses.

The motion to dismiss the complaint is denied. Plaintiff will be awarded an interlocutory injunction. Plaintiff will prepare and file proposed findings of fact, conclusions of law, and decree.

[11] Northern Pacific Ry. v. Henneford (D.C.) 15 F.Supp. 302.