COMPAÑÍA AZUCARERA DEL TOA, Appellant, *v.* PUBLIC SERVICE COMMISSION OF PUERTO RICO, Appellee.

No. 9934.  Argued January 10, 1950.—Decided April 13, 1950.

Gabriel de la Haba, Damián Monserrat, Jr., and Rafael Baragaño, Jr., for appellant. Vicente Géigel Polanco, Attorney General, and A. Torres Braschi, Assistant Attorney General, for appellee. José G. González and E. T. Sifre, Jr., as amici curiae.

MR. JUSTICE SNYDER delivered the opinion of the Court.

This is an appeal by Compañía Azucarera del Toa from a judgment of the Tribunal for the District of San Juan affirming orders of the Public Service Commission fixing temporary rates to be charged by the company during the 1944–45 crop season for grinding cane for its colonos.[1]

The first assignment is that the lower court "committed error in holding that the Public Service Commission had complied strictly with the letter of Act No. 12 of April 9, 1941

---

[1] South Porto Rico Sugar Co. v. Public Service Commission, No. 10053, and A. Roig Sucrs., S. en C. v. Public Service Commission, No. 10054, in which the Commission fixed temporary rates for the 1945–46 crop season, are being decided today on the basis of this opinion.

in fixing the temporary rate for the appellant for 1944–45, and that it acted correctly in using as a rate base solely original cost less depreciation; and in deciding that in the determination of a temporary rate the Commissioner was not compelled to consider any other element of value and did not have to give any weight or value to such other factors as cost of reproduction, working capital, capital invested in materials and going concern value, because that is required only when permanent rates are fixed."

■ We examine first the basis on which the Commission is authorized to fix temporary rates for sugar companies. Under § 12 of Act No. 221, Laws of Puerto Rico, 1942, companies engaged in the processing and refining of sugar are declared to be public utilities. · See *People* v. *A. Roig, S. en C.,* 63 P.R.R. 17, affirmed in 147 F.(2) 87 (C. A. 1, 1945). By virtue of § 13(a) and other Sections, the Commission was empowered to fix the rates which the companies may charge *colonos* for grinding cane.

■■ In the statement of motives in Act No. 221, the Legislature listed seventeen "conclusions". The seventeenth was that the sugar companies "should be assured of earning a reasonable income on their actually and usefully invested capital." And § 17(f) directed the Commission "to determine the annual percentage that each sugar company should receive as reasonable benefit [profit] on its invested capital." To enable the Commission to determine what constituted the "invested capital" on which the companies were to receive a reasonable profit, the Legislature provided in § 33 the following:

"The Commission shall have power, upon application or upon its own motion,·to establish and determine the fair value of the property of every sugar company in Puerto Rico, and to determine any matter in connection with such value; and shall exercise the said power whenever the exercise of such power is

required of it, or whenever it shall deem such valuation or determination necessary or proper under any of the provisions of this Act.

"(a) In ascertaining and determining such fair value, the Commission may determine every fact, matter, or thing which, in its judgment, does or may have any bearing on such value; and may take into consideration the original cost of construction, particularly with reference to the amount expended in the existing and useful permanent improvements, the historical development of the sugar company in question, the market value of its bonds and stocks, the probable earning capacity of the property under the particular rates, prices, compensation, standards, and conditions prescribed by statute or ordinance, regulation or rules, or fixed or proposed by the Commission, and the items of expenditure for obsolete equipment and construction; the production costs of the property, based upon the fair average price of materials, property, and labor, and the development and going-concern value of such sugar company, and these and any other elements of value shall be given such weight by the Commission as may be just and right in each case."

In *Smyth* v. *Ames*, 169 U.S. 466, the court held that the due process clause required that the rate fixed by a Public Commission for service rendered by a public utility to the public must yield a fair return to the utility on the fair value of the property devoted to said service. It also held that in determining the fair value of the property, certain factors of value must be taken into consideration. Section 33 (a) is essentially a restatement of these factors.

We need not stop to consider the argument that *Smyth* v. *Ames* is no longer good constitutional law and consequently that the Legislature may now, if it chooses, validly provide that the Commission may fix the rates that both traditional utilities and sugar companies may charge without taking into consideration all the elements of value recited in *Smyth* v. *Ames* and § 33 (a). *Cf. Power Comm'n* v. *Pipeline Co.*, 315 U. S. 575; *Power Comm'n* v. *Hope Gas Co.*, 320 U. S. 591;

*Market Street R. Co.* v. *Comm'n*, 324 U. S. 548.[2]  Nor are we concerned with the fact that the courts have upheld the power of the Legislature to fix the prices sugar mills may charge *colonos* for grinding cane without reference to the said factors of valuation.  *Vidal* v. *Fernández*, 104 F. (2) 606 (C. A. 1, 1939), cert. denied, 308 U. S. 602; see *Secretary of Agriculture* v. *Central Roig Refining Company et al.*, 338 U. S. 604, decided February 6, 1950.  The Legislature chose (1) to provide in Act No. 221 that sugar companies shall be public utilities and (2) to require the Comission pursuant to § 33 (a) of Act No. 221 to consider all the elements of value recited in that Section when determining the value of the property of sugar companies for rate purposes.[3]  While § 33 (a) remains on the statute books, it is therefore the duty of the Commission to consider all these elements of value in determining a rate base for the purpose of fixing a permanent rate.

However, experience over a period of many years in a number of states demonstrated that fixing *permanent* rates for classical public utilities pursuant to the *Smith* v. *Ames* formula was a long and complicated process.  In view of this experience, New York tried the expedient of establishing temporary rates without taking into consideration all the elements of value laid down in *Smyth* v. *Ames*.  This was

---

[2] See *Wilson* v. *Brown*, 137 F. (2) 348, 351 (Emerg. Ct. Apps., 1943); Freeman, An "Enlightened Judgment" Approach to Rate of Return, 61 Harv.L.Rev. 1380;  Hale, Utility Regulation in the Light of The Hope Natural Gas Case, 44 Col.L.Rev. 488;  Bauer, The Establishment and Administration of a "Prudent Investment" Rate Base, 53 Yale L.J. 495; Burt and Highsaw, Developmental Costs under the Prudent Investment Theory, 94 U.Pa.L.Rev. 1;  51 Yale L.J. 1027;  Rottschaefer, The Constitution and Socio-Economic Change, pp. 162–169;  Rottschaefer, Cases on Constitutional Law, 1948 ed., p. 566, Note.

[3] The Commission does not argue that § 33 (a) is merely permissive and not mandatory.  We think it is correct in not pressing such an argument.  Since § 33 (a) was enacted when *Smyth* v. *Ames* was still good law, the Legislature obviously intended, at the time it enacted § 33 (a), that it be mandatory, in order to avoid grave constitutional difficulties which were thought to exist at that time.  See *Bronx Gas & Electric Co.* v. *Maltbie*, 3 N.E. (2) 512 (N. Y., 1936).

rejected by the Supreme Court as violative of due process of law. *Prendergast* v. *N. Y. Tel. Co.*, 262 U.S. 43. But New York tried again. This time it adopted a statute authorizing the fixing of a temporary rate, to be effective until the permanent rate is fixed, which would provide a return of not less than 5% on original depreciated cost. To save the constitutionality of this new statute, the Commission was "authorized" to consider the effect of the temporary rate in fixing the permanent rate. Section 114 of the Public Service Law, Consol. Laws, c. 48.

In a case challenging a temporary rate fixed in this manner, the New York Court of Appeals upheld this statute. It held in *Bronx Gas & Electric Co.* v. *Maltbie*, 3 N. E. (2) 512, that it was passed (p. 515) "to meet the criticism in the Prendergast Case and to follow the way impliedly pointed out for a proper law." It described the manner in which the statute worked as follows (p. 515):

> *"The commission fixes a temporary rate pending the hearing.* It is based upon the elements stated, which are not all of those required to fix a permanent rate. As before stated, this would be impossible, if we must consider in fixing a temporary rate all the elements required for the final rate: no temporary rate could ever be fixed. This also is self-evident. Therefore, to meet these conditions the temporary rate is fixed, within reasonable limits, upon figures which can be with some exactness obtained from the books of the company, showing original cost or investment; *and if finally, when the proceeding ends, the temporary rate is proved to have been too low,* the utility must be permitted and authorized to charge enough for its service to make up the loss. The consumer must pay what he should have paid, and the only way to do it is to fix a rate high enough to make up this loss." (Italics ours).

The New York court thought the statute was constitutional despite the *Prendergast* case and *Smyth* v. *Ames*, because (p. 516) "the commission is authorized, in fact *compelled*, to make up this loss, if any, [resulting from the temporary rate] through the final rate . . . This section, as we

have said, *forces* the Public Service Commission to consider the returns from the temporary rate and to establish the permanent rate, or the final rate, accordingly; that is, if the temporary rate has proved to be too low, the final rate must make it up to the company. Over what time it is necessary to provide a rate sufficient to make up the loss, or to include the take-up, is a matter of adjustment, machinery, and method. . . ." (Matter in brackets and italics ours).

The net result is that the *Maltbie* case upholds as constitutional a statute which authorizes the fixing of a temporary rate which yields 5% of the original depreciated cost of the property of a classical utility even under the earlier cases which held that the due process clause requires all the other elements of value recited in *Smyth* v. *Ames* to be taken into consideration in establishing a permanent rate. But it is obvious that the New York statute does not authorize the fixing of a temporary rate *in vacuo*. On the contrary, the authority of the Commission to fix a temporary rate without reference to the other factors of valuation is predicated on the pendency of a proceeding to fix a permanent rate. In addition to the clear statements to that effect in the *Maltbie* case, the Court of Appeals of New York recently reiterated this requirement in *Consolidated Edison Co. of New York* v. *Maltbie*, 90 N. E. (2) 35 (N. Y., 1949) at p. 37: "The time limitation implicit in the statute is that temporary rates can be imposed *only after a permanent rate proceeding has been commenced* and before its final determination." (Italics ours).

Our Legislature followed the lead of New York. It also realized that if the *Smyth* v. *Ames* formula were followed in evaluating property as a rate base for a permanent rate to be charged by traditional public utilities, the proceedings would be unduly prolonged. Consequently, it passed Act No. 12, Laws of Puerto Rico, 1941, which added § 24 (*a*) to our Public Service Commission Act, Act No. 70, Laws of Puerto

Rico, 1917, Vol. II.[4]   A comparison of § 24(a) and the New York statute makes it evident that the Commission and the lower court were correct in stating that § 24(a) is, for the present purposes, identical to the New York statute.

As already noted, in 1942 the Legislature declared sugar companies to be public utilities. And in doing so it chose, by § 33(a) of Act No. 221, to require the Commission to fix their permanent rates on a rate base which must be determined pursuant to the *Smyth* v. *Ames* formula. But it realized that, just as in the case of traditional public utilities, this would be a long drawn out process. It therefore provided in § 68 of Act No. 221 that the "provisions of Act No.

---

[4] Section 24(a) reads as follows:

"For the purpose of obtaining the greatest possible speed in the transaction of all cases in which the commission may have to determine the reasonableness of the rates. of any public-service enterprise, the commission may require any public-service company to make and keep always in order a detailed, continuing property record of all the physical property used for the public service rendered by it; and it may require, further, that the said public-service company keep its books, accounts, and records in such form as may at all times show the original cost of said physical property, as well as the reserves accumulated for paying for the withdrawal or replacement thereof.

"*In any proceeding filed to determine the reasonableness of the rates of any public-service enterprise, the commission may,* after notice is served and a hearing is held, in those cases where, in its judgment, such action is required for public benefit, fix, determine, and *prescribe provisional rates which shall be put into effect* by the public-service company involved, *during the time necessary for the determination of the rates which should finally be in effect.*

"The provisional rates so determined and prescribed shall be based on the need to provide a return of not less than five (5)' per cent on the original cost, less the depreciation suffered by the physical property used in the service rendered by the public-service company involved in the case. If the reports, duly certified by the said company, do not include the original cost less the depreciation of the said property, the commission may estimate said cost and depreciation and fix, determine, and prescribe the rates in the manner herein provided.

"*The temporary rates thus determined and prescribed shall be in effect until the rates finally fixed and prescribed as reasonable go into effect.* In the determination of the reasonable final rates which are to be put into effect for an indeterminate period, the commission may take into consideration the economic consequences which might be brought about by the rates prescribed for temporary operation." (Italics ours).

12, approved April 9, 1941, shall likewise be applicable to sugar companies." The Commission was thus authorized to fix temporary rates to be charged by sugar companies pursuant to § 24(a).

■■■ With the foregoing background, we turn to the facts of the present case. Here the Commission fixed what it called a temporary rate which Compañía Azucarera del Toa could charge its *colonos* for grinding cane during the 1944-45 crop season.[5] It is undisputed that the Commission did not take into consideration the various elements of value provided in § 33(a). On the contrary, its orders specifically recite that it fixed the alleged temporary rate solely on the basis of 5% of the original cost of the property less depreciation, as provided in § 24(a). The validity of the temporary rate must therefore stand or fall, as the Commission concedes, on whether it had authority to act under the terms of § 24(a).

We have already seen that the New York statute from which § 24(a) was copied specifically provides, and the New York cases interpreting it hold, that a temporary rate may be fixed only if a proceeding to fix a permanent rate is pending. The reason for this is evident. The provisional rate is only a temporary stop gap. Because the statute—and formerly and possibly still the constitution—requires a different formula in determining the value of the property of the utility, the temporary rate must be superseded as soon as possible by a permanent rate, which will be sufficiently high to reimburse the company for the losses, if any, sustained under the temporary rate. To provide that a temporary rate might be fixed even though a proceeding for a permanent rate was not pending, would raise a substantial constitutional question. See *Prendergast* v. *N. Y. Tel. Co.*, *supra*. In addition, it would be contrary to the very purpose of the statute: to fix a temporary rate during the prolonged period required for a permanent rate proceeding.

---

[5] Similar so-called temporary rates were fixed for the 1942-43 and 1943-44 crop seasons.

The present case is a vivid example of what the Legislature had in mind. The record shows that no proceeding to fix a permanent rate for this company has ever been filed and that no hearings for that purpose have ever been held. Yet, under the guise of fixing a "temporary rate", the Commission has every year established a rate to be charged by the company for each crop season from 1942 to 1946. And we were informed at the oral argument that this practice has continued to date.

The facts are not substantially different in the *Roig* and *South Porto Rico* cases. Those cases involve temporary rates for the 1945–46 crop season. It is true that in providing for hearings for temporary rates in these cases, orders of the Commission recite that "studies related to the valuation of the properties" of these companies have been initiated. But at the most such a study is preliminary to the initiation of a proceeding, which might thereafter be duly filed pursuant to the requirements of law for notice and hearing. Indeed, the Commission might after such an investigation conclude that no proceeding at all was necessary. Obviously, the mere making of an *ex parte* investigation does not constitute the filing of a proceeding.

The Commission itself in effect concedes that no proceeding has been initiated to fix a permanent rate in any case. In its reply brief in the *South Porto Rico* case the Commission asserts that in 1944 it made studies of the accounting methods of the various companies and "also initiated valuation studies" in order to establish a rate base. It goes on to state that these studies have been suspended pending the establishment of uniform standards for the industry. According to the Commission, "We do not consider that it would be good public administration to proceed to establish permanent rates without having regulated the sugar industry in all its aspects." It is not for us to determine whether this policy of delay on the part of the Commission in instituting proceedings for permanent rates is wise. We discharge our function

when we hold that until a proceeding to fix permanent rates for a particular company is initiated, the Commission may not fix the temporary rates that company may charge its *colonos* by virtue of § 24 (*a*).

The Commission makes another point in support of its practice of fixing temporary rates for each crop season over a period of years without initiating a proceeding for a permanent rate. In its reply brief in the *South Porto Rico* case, it says the following: "The operation of the sugar centrals under temporary rates, for a number of years, will permit the Commission to observe the economic result of these rates in each of the sugar centrals, so that when permanent rates are established, it will be done with the full knowledge that they will be fair and reasonable." We do not stop to determine if that practice would be constitutional. *Cf. Prendergast* v. *N. Y. Tel. Co., supra,* and *Bronx Gas & Electric Co.* v. *Maltbie, supra,* with *Vidal* v. *Fernández, supra.* A short answer to this argument is that the Legislature has not authorized any such practice. Rather it has copied the New York statute and provided in § 24 (*a*) that a temporary rate shall be fixed for traditional public utilities and for sugar companies only while a proceeding for a permanent rate is pending.

At the oral argument it was also indicated that for budgetary reasons the Commission has been unable to initiate proceedings to fix permanent rates. But this argument is not an answer to the specific mandate of § 24 (*a*). The Legislature directed the Commission to fix permanent rates. As an incident thereto, it authorized the Commission to fix a temporary rate in a pending permanent rate proceeding. But the Commission lacks authority to fix a so-called temporary rate for a specific period year after year without ever instituting a proceeding for a permanent rate. If the Commission for budgetary reasons is unable to initiate a permanent rate proceeding, it must obtain either additional funds or amendments of §§ 24 (*a*) and 33 (*a*). But, pleading lack of funds, it

cannot simply ignore § 24(a) and set temporary rates where no proceeding for a permanent rate has been initiated.

Precisely because a permanent rate proceeding has neither been initiated nor pressed to completion as promptly as possible, we think there is considerable force in the argument of the appellant that in practical effect the temporary rates have become permanent rates for the particular crop year for which each so-called temporary rate was fixed.[6] Such a result would of course be violative of Act No. 221, since permanent rates must under § 33(a) be fixed pursuant to the *Smyth* v. *Ames* formula, whereas temporary rates may be fixed under § 24(a) merely on the basis of original cost less depreciation.

The Commission also argues that its failure to initiate permanent proceeding should not be taken into consideration by us as the appellant does not assign this as an error. The appellant specifically raised this point as the first ground of its motion for reconsideration before the Commission. The latter denied the motion without discussing this matter. The appellant made the same allegation in paragraph 11(g) of its complaint in the lower court, which also ignored it. And

---

[6] The argument that these temporary rates are in effect permanent rates may be summarized as follows: It is true that under § 24(a) theoretically the sugar companies could be reimbursed for losses under insufficient temporary rates by higher rates when the permanent rates are finally fixed. See *Bronx Gas & Electric Co.* v. *Maltbie, supra.* But eight years have elapsed and no proceeding has even been initiated to fix a permanent rate. Even after they are begun, such proceedings are almost interminable. Moreover, the Supreme Court has stated that "It must be recognized that each utility presents an individual problem." *Driscoll* v. *Edison Co.,* 307 U.S. 104, 119. This means that as public utilities each of the thirty four sugar companies must have a full and separate hearing on the issue of the value of its property. Also, the nature of the sugar business in Puerto Rico contrasts sharply with that of a traditional utility with a stable market. *Cf. Secretary of Agriculture* v. *Central Roig Refining Co. et al., supra;* Perloff, Puerto Rico's Economic Future, p. 67 *et seq.* Under all these circumstances, it is highly dubious that losses; if any, sustained by the companies under temporary rates could be recovered in the distant and unascertainable future through the device of fixing, many years from now, a higher permanent rate than the services are worth at that time to be paid by the same or different *colonos* in the next generation.

although the first assignment of error here is phrased somewhat loosely, we think the appellant could have argued this point under its statement in the first assignment that the lower court "committed error in holding that the Public Service Commission had complied strictly with the letter of Act No. 12 . . .". Be that as it may, it must be conceded that there is no detailed argument on this question in appellant's brief. However, it was discussed extensively at the oral argument. And it is argued at considerable length in the briefs of the *amici curiae* in this case and in the *South Porto Rico* case and in the reply brief of the Commission to the latter. Most important of all, the lack of authority of the Commission to fix a temporary rate where no proceeding for a permanent rate is pending is substantially equivalent or at least analogous to a lack of jurisdiction. It is the duty of this Court to examine jurisdictional defects *motu proprio*. We therefore think we would have been obliged to base our judgment on this point even if the parties had not called it to our attention.

We hold that in view of the fact that no proceeding to fix a permanent rate is pending, the Commission lacked authority to fix the so-called temporary rates which it established as the rates Compañía Azucarera del Toa could charge its *colonos* for grinding cane during the 1944–45 crop season. This makes it unnecessary for us to decide the host of other questions raised here and in the *South Porto Rico* and *Roig* cases, decided today on the basis of this opinion. Among the questions we leave open is the challenge in the latter cases to the constitutionality of § 24 (a).[7]

---

[7] On this point, in addition to *Bronx Gas & Electric Co.* v. *Maltbie*, *supra*, *cf. Driscoll* v. *Edison Co.*, 307 U.S. 104, 114, which characterizes this as a "novel and important question" of constitutionality and leaves it open in passing on a somewhat similar Pennsylvannia statute. For other cases involving the latter statute, see *Beaver Valley Water Co.* v. *Driscoll*, 28 F.Supp. 722 (Dist.Ct., Pa., 1939); *Edison Light & Power Co.* v. *Driscoll*, 25 F.Supp. 192 (Dist.Ct., Pa., 1938); *Beaver Valley Water Co.* v. *Driscoll*, 23 F.Supp. 795 (Dist. Ct., Pa., 1938); *Edison Light & Power Co.* v. *Driscoll*, 21 F. Supp. 1 (Dist. Ct., Pa., 1937); see also, 87 U.Pa.L. Rev. 456; 38 Mich. L. Rev. 72; 34 Ill. L. Rev. 214–17, 929 *et seq.*

We think it unfortunate that eight years after approval of Act No. 221 no valid rates have as yet been established thereunder for grinding cane for *colonos*. But the remedy is in the hands of the Legislature and the Public Service Commission, and not in ours.

The judgment of the district court will be reversed and a new judgment entered declaring null and void the orders of March 4, 1946 and December 20, 1946 of the Public Service Commission fixing the rates Compañía Azucarera del Toa was entitled to charge its *colonos* for grinding cane during the 1944–45 crop season.

Mr. Justice Negrón Fernández did not participate herein.